1

```
 1                 UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF CONNECTICUT
 2                       BRIDGEPORT DIVISION

 3

 4   IN RE:                    .  Chapter 11
                               .  Case No. 22-50073 (JAM)
 5   HO WAN KWOK, et al.,      .
                               .  (Jointly Administered)
 6           Debtors.          .
     . . . . . . . . . . . . . .
 7                             .
     LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8   11 TRUSTEE FOR THE        .  No. 24-05005 (JAM)
     ESTATE OF HO WAN KWOK,    .
 9                             .
             Plaintiff,        .
10                             .
        v.                     .
11                             .
     AGORA LAB, INC.,          .
12                             .
             Defendant.        .
13   . . . . . . . . . . . . . .
                               .
14   LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05006 (JAM)
15   OF HO WAN KWOK,           .
                               .
16           Plaintiff,        .
                               .
17      v.                     .  Courtroom 123
                               .  Brien McMahon Federal Building
18   AMAZON WEB SERVICES,      .  915 Lafayette Boulevard
     INC.,                     .  Bridgeport, Connecticut 06604
19                             .
             Defendant.        .  Wednesday, January 15, 2025
20   . . . . . . . . . . . . . .  12:55 p.m.

21           - Cont'd -

22

23

24

25
```

```
 1   LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05010 (JAM)
 2   OF HO WAN KWOK,           .
                               .
 3           Plaintiff,        .
                               .
 4      v.                     .
                               .
 5   DIRECT PERSUASION, LLC,   .
                               .
 6           Defendant.        .
     . . . . . . . . . . . . . .
 7                             .
     LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8   11 TRUSTEE FOR THE ESTATE .  No. 24-05015 (JAM)
     OF HO WAN KWOK,           .
 9                             .
             Plaintiff,        .
10                             .
        v.                     .
11                             .
     FOX NEWS NETWORK, LLC,    .
12                             .
             Defendant.        .
13   . . . . . . . . . . . . . .
                               .
14   LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05031 (JAM)
15   OF HO WAN KWOK,           .
                               .
16           Plaintiff,        .
                               .
17      v.                     .
                               .
18   ARRI AMERICAS, INC.,      .
                               .
19           Defendant.        .
     . . . . . . . . . . . . . .
20

21          - Cont'd -

22

23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05044 (JAM)
 2  OF HO WAN KWOK,           .
                              .
 3           Plaintiff,       .
                              .
 4      v.                    .
                              .
 5  TERIS-PHOENIX, LLC,       .
                              .
 6           Defendant.       .
    . . . . . . . . . . . . . .
 7                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8  11 TRUSTEE FOR THE ESTATE .  No. 24-05047 (JAM)
    OF HO WAN KWOK,           .
 9                            .
             Plaintiff,       .
10                            .
        v.                    .
11                            .
    PHILLIPS NIZER, LLP,      .
12                            .
             Defendant.       .
13  . . . . . . . . . . . . . .
                              .
14  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05048 (JAM)
15  OF HO WAN KWOK,           .
                              .
16           Plaintiff,       .
                              .
17      v.                    .
                              .
18  MARK GUNDERSON,           .
                              .
19           Defendant.       .
    . . . . . . . . . . . . . .
20
            - Cont'd -
21

22

23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .   Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .   No. 24-05055 (JAM)
 2  OF HO WAN KWOK,           .
                              .
 3          Plaintiff,        .
                              .
 4      v.                    .
                              .
 5  270 W. 39th Street        .
    Co., LLC,                 .
 6                            .
            Defendant.        .
 7  . . . . . . . . . . . . . .
                              .
 8  LUC A. DESPINS, CHAPTER   .   Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .   No. 24-05056 (JAM)
 9  OF HO WAN KWOK,           .
                              .
10          Plaintiff,        .
                              .
11      v.                    .
                              .
12  FFP (BVI) LIMITED,        .
                              .
13          Defendant.        .
    . . . . . . . . . . . . . .
14                            .
    LUC A. DESPINS, CHAPTER   .   Adversary Proceeding
15  11 TRUSTEE FOR THE ESTATE .   No. 24-05057 (JAM)
    OF HO WAN KWOK,           .
16                            .
            Plaintiff,        .
17                            .
        v.                    .
18                            .
    AMAZON.COM, INC., HING    .
19  CHI NGOK, ALEX            .
    HADJICHARALAMBOUS,        .
20  CHUNGUANG HAN, and MEI    .
    GUO,                      .
21                            .
            Defendants.       .
22  . . . . . . . . . . . . . .

23          - Cont'd -

24

25
```

```
 1   LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05058 (JAM)
 2   OF HO WAN KWOK,           .
                               .
 3          Plaintiff,         .
                               .
 4      v.                     .
                               .
 5   ANTHEM HEALTH PLANS,      .
     INC.,                     .
 6                             .
            Defendant.         .
 7   . . . . . . . . . . . . . .
                               .
 8   LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05059 (JAM)
 9   OF HO WAN KWOK,           .
                               .
10          Plaintiff,         .
                               .
11      v.                     .
                               .
12   FEDERAL EXPRESS           .
     CORPORATION,              .
13                             .
            Defendant.         .
14   . . . . . . . . . . . . . .
                               .
15   LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05063 (JAM)
16   OF HO WAN KWOK,           .
                               .
17          Plaintiff,         .
                               .
18      v.                     .
                               .
19   DJD CREATIVE, LLC,        .
                               .
20          Defendant.         .
     . . . . . . . . . . . . . .
21
              - Cont'd -
22

23

24

25
```

```
 1   LUC A. DESPINS, CHAPTER    .   Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .   No. 24-05069 (JAM)
 2   OF HO WAN KWOK,            .
                                .
 3             Plaintiff,       .
                                .
 4       v.                     .
                                .
 5   B&H FOTO & ELECTRONICS     .
     CORP., HING CHI NGOK,      .
 6   ALEX HADJICHARALAMBOUS,    .
     and CHUNGUANG HAN,         .
 7                              .
               Defendants.      .
 8   . . . . . . . . . . . . .  .
                                .
 9   LUC A. DESPINS, CHAPTER    .   Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .   No. 24-05077 (JAM)
10   OF HO WAN KWOK,            .
                                .
11             Plaintiff,       .
                                .
12       v.                     .
                                .
13   AMERICAN EXPRESS COMPANY, .
                                .
14             Defendant.       .
     . . . . . . . . . . . . .  .
15                              .
     LUC A. DESPINS, CHAPTER    .   Adversary Proceeding
16   11 TRUSTEE FOR THE ESTATE .   No. 24-05082 (JAM)
     OF HO WAN KWOK,            .
17                              .
               Plaintiff,       .
18                              .
         v.                     .
19                              .
     OHTZAR SHLOMO SOLOMON      .
20   TREASURE, LLC,             .
                                .
21             Defendant.       .
     . . . . . . . . . . . . .  .
22
             - Cont'd -
23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05092 (JAM)
 2  OF HO WAN KWOK,           .
                              .
 3           Plaintiff,       .
                              .
 4      v.                    .
                              .
 5  ZETA GLOBAL CORP.,        .
                              .
 6           Defendant.       .
    . . . . . . . . . . . . . .
 7                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8  11 TRUSTEE FOR THE ESTATE .  No. 24-05100 (JAM)
    OF HO WAN KWOK,           .
 9                            .
             Plaintiff,       .
10                            .
        v.                    .
11                            .
    GROCYBER, LLC,            .
12                            .
             Defendant.       .
13  . . . . . . . . . . . . . .
                              .
14  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05108 (JAM)
15  OF HO WAN KWOK,           .
                              .
16           Plaintiff,       .
                              .
17      v.                    .
                              .
18  CONSERVATIVE CAMPAIGN     .
    TECHNOLOGY, LLC,          .
19                            .
             Defendant.       .
20  . . . . . . . . . . . . . .

21          - Cont'd -

22

23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05110 (JAM)
 2  OF HO WAN KWOK,           .
                              .
 3           Plaintiff,       .
                              .
 4      v.                    .
                              .
 5  AARON MITCHELL,           .
                              .
 6           Defendant.       .
    . . . . . . . . . . . . . .
 7                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8  11 TRUSTEE FOR THE ESTATE .  No. 24-05112 (JAM)
    OF HO WAN KWOK,           .
 9                            .
             Plaintiff,       .
10                            .
      v.                      .
11                            .
    EMPIRE BLUE CROSS BLUE    .
12  SHIELD and ANTHEM         .
    HEALTHCHOICE ASSURANCE,   .
13  INC.,                     .
                              .
14           Defendant.       .
    . . . . . . . . . . . . . .
15                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
16  11 TRUSTEE FOR THE ESTATE .  No. 24-05114 (JAM)
    OF HO WAN KWOK,           .
17                            .
             Plaintiff,       .
18                            .
      v.                      .
19                            .
    MODSQUAD, INC.,           .
20                            .
             Defendant.       .
21  . . . . . . . . . . . . . .

22         - Cont'd -

23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05115 (JAM)
 2  OF HO WAN KWOK,           .
                              .
 3           Plaintiff,       .
                              .
 4       v.                   .
                              .
 5  CLOUDFARE, INC.,          .
                              .
 6           Defendant.       .
    . . . . . . . . . . . . . .
 7                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8  11 TRUSTEE FOR THE ESTATE .  No. 24-05120 (JAM)
    OF HO WAN KWOK,           .
 9                            .
             Plaintiff,       .
10                            .
         v.                   .
11                            .
    3 COLUMBUS CIRCLE, LLC,   .
12                            .
             Defendant.       .
13  . . . . . . . . . . . . . .
                              .
14  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05122 (JAM)
15  OF HO WAN KWOK,           .
                              .
16           Plaintiff,       .
                              .
17       v.                   .
                              .
18  INDIUM SOFTWARE, INC.,    .
                              .
19           Defendant.       .
    . . . . . . . . . . . . . .
20
             - Cont'd -
21

22

23

24

25
```

```
 1   LUC A. DESPINS, CHAPTER    .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE .  No. 24-05128 (JAM)
 2   OF HO WAN KWOK,            .
                                .
 3            Plaintiff,        .
                                .
 4       v.                     .
                                .
 5   MILLER MOTORCARS, INC.,    .
                                .
 6            Defendant.        .
     . . . . . . . . . . . . .  .
 7                              .
     LUC A. DESPINS, CHAPTER    .  Adversary Proceeding
 8   11 TRUSTEE FOR THE ESTATE .  No. 24-05130 (JAM)
     OF HO WAN KWOK,            .
 9                              .
              Plaintiff,        .
10                              .
         v.                     .
11                              .
     ON THE SPOT HOME           .
12   IMPROVEMENT, INC.,         .
                                .
13            Defendant.        .
     . . . . . . . . . . . . .  .
14                              .
     LUC A. DESPINS, CHAPTER    .  Adversary Proceeding
15   11 TRUSTEE FOR THE ESTATE .  No. 24-05134 (JAM)
     OF HO WAN KWOK,            .
16                              .
              Plaintiff,        .
17                              .
         v.                     .
18                              .
     V.X. CERDA &               .
19   ASSOCIATES, P.A.,          .
                                .
20            Defendant.        .
     . . . . . . . . . . . . .  .
21
              - Cont'd -
22

23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE  .  No. 24-05135 (JAM)
 2  OF HO WAN KWOK,            .
                               .
 3          Plaintiff,         .
                               .
 4      v.                     .
                               .
 5  LIBERTY JET MANAGEMENT     .
    CORP.,                     .
 6                             .
            Defendant.         .
 7  . . . . . . . . . . . . .  .
                               .
 8  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE  .  No. 24-05138 (JAM)
 9  OF HO WAN KWOK,            .
                               .
10          Plaintiff,         .
                               .
11      v.                     .
                               .
12  TARGET ENTERPRISES, LLC,   .
                               .
13          Defendant.         .
    . . . . . . . . . . . . .  .
14                             .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
15  11 TRUSTEE FOR THE ESTATE  .  No. 24-05141 (JAM)
    OF HO WAN KWOK,            .
16                             .
            Plaintiff,         .
17                             .
        v.                     .
18                             .
    FLAT RATE MOVERS, LTD.,    .
19                             .
            Defendant.         .
20  . . . . . . . . . . . . .  .

21          - Cont'd -

22

23

24

25
```

```
 1   LUC A. DESPINS, CHAPTER    .   Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .   No. 24-05147 (JAM)
 2   OF HO WAN KWOK,            .
                                .
 3           Plaintiff,         .
                                .
 4       v.                     .
                                .
 5   JAMESTOWN ASSOCIATES,      .
     LLC,                       .
 6                              .
             Defendant.         .
 7   . . . . . . . . . . . . .  .
                                .
 8   LUC A. DESPINS, CHAPTER    .   Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .   No. 24-05162 (JAM)
 9   OF HO WAN KWOK,            .
                                .
10           Plaintiff,         .
                                .
11       v.                     .
                                .
12   NARDELLO & CO., LLC,       .
                                .
13           Defendant.         .
     . . . . . . . . . . . . .  .
14                              .
     LUC A. DESPINS, CHAPTER    .   Adversary Proceeding
15   11 TRUSTEE FOR THE ESTATE  .   No. 24-05168 (JAM)
     OF HO WAN KWOK,            .
16                              .
             Plaintiff,         .
17                              .
         v.                     .
18                              .
     THE FRANCIS FIRM PLLC,     .
19                              .
             Defendant.         .
20   . . . . . . . . . . . . .  .

21           - Cont'd -

22

23

24

25
```

```
 1  LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
    11 TRUSTEE FOR THE ESTATE .  No. 24-05186 (JAM)
 2  OF HO WAN KWOK,           .
                              .
 3          Plaintiff,        .
                              .
 4      v.                    .
                              .
 5  BERKELEY ROWE LIMITED,    .
                              .
 6          Defendant.        .
    . . . . . . . . . . . . . .
 7                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
 8  11 TRUSTEE FOR THE ESTATE .  No. 24-05196 (JAM)
    OF HO WAN KWOK,           .
 9                            .
            Plaintiff,        .
10                            .
        v.                    .
11                            .
    MORVILLO ABRAMOWITZ GRAND .
12  IASON & ANELLO, P.C.,     .
                              .
13          Defendant.        .
    . . . . . . . . . . . . . .
14                            .
    LUC A. DESPINS, CHAPTER   .  Adversary Proceeding
15  11 TRUSTEE FOR THE ESTATE .  No. 24-05199 (JAM)
    OF HO WAN KWOK,           .
16                            .
            Plaintiff,        .
17                            .
        v.                    .
18                            .
    LAWALL & MITCHELL, LLC,   .
19  and AARON MITCHELL,       .
                              .
20          Defendants.       .
    . . . . . . . . . . . . . .
21
            - Cont'd -
22

23

24

25
```

```
 1   LUC A. DESPINS, CHAPTER    .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .  No. 24-05202 (JAM)
 2   OF HO WAN KWOK,            .
                               .
 3           Plaintiff,         .
                               .
 4      v.                      .
                               .
 5   CLAYMAN ROSENBERG          .
     KIRSHNER & LINDER, LLP,    .
 6                             .
             Defendant.         .
 7   . . . . . . . . . . . . . .
                               .
 8   LUC A. DESPINS, CHAPTER    .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .  No. 24-05204 (JAM)
 9   OF HO WAN KWOK,            .
                               .
10           Plaintiff,         .
                               .
11      v.                      .
                               .
12   G4S SECURITY SYSTEMS       .
     (HONG KONG) LTD.,          .
13                             .
             Defendant.         .
14   . . . . . . . . . . . . . .
                               .
15   LUC A. DESPINS, CHAPTER    .  Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .  No. 24-05208 (JAM)
16   OF HO WAN KWOK,            .
                               .
17           Plaintiff,         .
                               .
18      v.                      .
                               .
19   ZEISLER & ZEISLER, P.C.,   .
                               .
20           Defendant.         .
     . . . . . . . . . . . . . .
21
          - Cont'd -
22

23

24

25
```

```
 1   LUC A. DESPINS, CHAPTER   .   Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .   No. 24-05211 (JAM)
 2   OF HO WAN KWOK,            .
                               .
 3          Plaintiff,          .
                               .
 4      v.                      .
                               .
 5   PUTNAM'S LANDSCAPING,      .
     LLC,                       .
 6                             .
            Defendant.          .
 7   . . . . . . . . . . . . . .
                               .
 8   LUC A. DESPINS, CHAPTER   .   Adversary Proceeding
     11 TRUSTEE FOR THE ESTATE  .   No. 24-05219 (JAM)
 9   OF HO WAN KWOK,            .
                               .
10          Plaintiff,          .
                               .
11      v.                      .
                               .
12   JASON MILLER,             .
                               .
13          Defendant.          .
     . . . . . . . . . . . . . .
14                             .
     LUC A. DESPINS, CHAPTER   .   Adversary Proceeding
15   11 TRUSTEE FOR THE ESTATE  .   No. 24-05222 (JAM)
     OF HO WAN KWOK,            .
16                             .
            Plaintiff,          .
17                             .
        v.                      .
18                             .
     SEDGWICK REALTY CORP.,     .
19                             .
            Defendant.          .
20   . . . . . . . . . . . . . .

21          - Cont'd -

22

23

24

25
```

```
1                                 .
   LUC A. DESPINS, CHAPTER      .  Adversary Proceeding
2  11 TRUSTEE FOR THE ESTATE .    No. 24-05225 (JAM)
   OF HO WAN KWOK,               .
3                                 .
              Plaintiff,         .
4                                 .
        v.                       .
5                                 .
   CIRRUS DESIGN                  .
6  CORPORATION, and QIANG        .
   GUO,                          .
7                                 .
              Defendants.        .
8  . . . . . . . . . . . . . .   .
                                  .
9  LUC A. DESPINS, CHAPTER      .  Adversary Proceeding
   11 TRUSTEE FOR THE ESTATE .    No. 24-05226 (JAM)
10 OF HO WAN KWOK,               .
                                  .
11            Plaintiff,         .
                                  .
12       v.                      .
                                  .
13 ACASS CANADA, LTD.,           .
                                  .
14            Defendant.         .
   . . . . . . . . . . . . . .   .
15                                .
   LUC A. DESPINS, CHAPTER      .  Adversary Proceeding
16 11 TRUSTEE FOR THE ESTATE .    No. 24-05229 (JAM)
   OF HO WAN KWOK,               .
17                                .
              Plaintiff,         .
18                                .
        v.                       .
19                                .
   MARCUM, LLP,                   .
20                                .
              Defendant.         .
21 . . . . . . . . . . . . . .   .

22                  TRANSCRIPT OF HEARING
23         BEFORE THE HONORABLE JULIE A. MANNING
              UNITED STATES BANKRUPTCY JUDGE
24

25
```

APPEARANCES OF COUNSEL

**Luc A. Despins**
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

**Rowena A. Moffett**
Brenner, Saltzman & Wallman, LLP
271 Whitney Avenue
New Haven, CT 06511

**Benjamin D. Feder**
Kelley Drye & Warren LLP
Canterbury Green
201 Broad Street
Stamford, CT 06901

**Nicholas A. Bassett**
Paul Hastings, LLP
2050 M Street NW
Washington, DC 20036

**Patrick R. Linsey**
Neubert Pepe & Monteith, P.C.
195 Church St
13th Fl
New Haven, CT 06510

**Stuart M. Sarnoff**
O'Melveny & Myers LLP
1301 Avenue of the Americas
Ste 1700
New York, NY 10019

**Eric S. Goldstein**
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103

**Brian T. Peterson**
K&L Gates LLP
925 4th Ave Suite 2900
Seattle, WA 98104

**Darryl S. Laddin**
Arnall Golden Gregory LLP
171 17th Street, NW, Suite 2100
Atlanta, GA 30363

1                      <u>APPEARANCES (CONTINUED)</u>

2                         **Jeffrey M. Sklarz**
                          Green & Sklarz LLC
3                        One Audubon Street
                              3rd Floor
4                       New Haven, CT 06511

5                        **Stephen M. Kindseth**
                          Zeisler & Zeisler
6                         10 Middle Street
                             15th Floor
7                      Bridgeport, CT 06604

8

9

10

11

12

13

14

15

16

17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:        Electronically recorded

21   Transcription Company:  Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  <u>8</u>
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

1                                      INDEX

2    MOTIONS:                                                          PAGE

3    Matter
     No. 3857   Order Scheduling Hearing on Motions to Dismiss      5
4               and Motions for Judgment on the Pleadings.

5               Court's Ruling:                                     --

6    Matter
     No. 17     Motion to Dismiss Adversary Proceeding Filed
7               by Jeffrey M. Sklarz on behalf of FFP (BVI)
                Limited, Defendant
8
                Court's Ruling:
9
     Matter
10   No. 19     Motion to Dismiss Adversary Proceeding Filed
                by Jeffrey M. Sklarz on behalf of Aaron
11              Mitchell, Defendant

12              Court's Ruling:

13   Matter
     No. 16     Motion to Dismiss Adversary Proceeding Filed
14              by Jeffrey M. Sklarz on behalf of V.X. Cerda &
                Associates P.A., Defendant
15
                Court's Ruling:
16
     Matter
17   No. 15     Motion to Dismiss Adversary Proceeding Filed
                by Jeffrey M. Sklarz on behalf of The Francis
18              Firm PLLC, Defendant

19              Court's Ruling:

20   Matter
     No. 35     Motion to Dismiss Adversary Proceeding Filed
21              by Jeffrey M. Sklarz on behalf of Berkeley
                Rowe Limited, Defendant
22
                Court's Ruling:
23

24

25

1                                 INDEX

2   MOTIONS:                                              PAGE

3   Matter
    No. 11    Motion to Dismiss Adversary Proceeding Filed
4             by Jeffrey M. Sklarz on behalf of Weddle Law
              PPLC, Defendant
5
              Court's Ruling:
6
    Matter
7   No. 21    Motion to Dismiss Adversary Proceeding Filed
              by Jeffrey M. Sklarz on behalf of Lawall &
8             Mitchell, LLC, Aaron Mitchell, Defendants

9             Court's Ruling:

10  Matter
    No. 19    Amended Motion to Dismiss Adversary Proceeding
11            Filed by Michelle Amanda Antao on behalf of
              G4S Security Systems (Hong Kong) Ltd.,
12            Defendant

13            Court's Ruling:

14  Matter
    No. 26    Motion to Dismiss Adversary Proceeding re
15            Second Amended Complaint Filed by Jeffrey M.
              Sklarz on behalf of ACASS Canada LTD.,
16            Defendant

17            Court's Ruling:

18  Matter
    No. 19    Motion to Dismiss Adversary Proceeding Filed
19            by Patrick Tomasiewicz on behalf of Liberty
              Jet Management Corp., Defendant
20
              Court's Ruling:
21
    Matter
22  No. 17    Motion for Judgment on the Pleadings on Claim
              I of Complaint Filed by Nicholas A. Bassett on
23            behalf of Luc A. Despins, Plaintiff

24            Court's Ruling:

25  Transcriptionist's Certificate                        125

1          (Proceedings commenced at 10:17 a.m.)

2          THE DEPUTY:  Okay.  Case Number 22-50073, Ho Wan

3    Kwok -- excuse me -- Adversary Number 24-0506, Despins v FFP

4    BVI Ltd.; Adversary 24-5110, Despins v Mitchell; Adversary

5    24-5168, Despins v The Francis Firm PLLC; Adversary 24-5186,

6    Despins v Berkeley Rowe Limited; Adversary 24-5188, Despins v

7    Weddle Law, PLLC; Adversary 24-5199, Despins v Lawall &

8    Mitchell LLC, *et al.*; Adversary 24-5204, Despins v G4S

9    Security Systems Hong Kong, Ltd.; Adversary 24-50 -- sorry --

10   24-5226, Despins v ACASS Canada, Ltd.; Adversary 24-5135,

11   Despins v Liberty Jet Management Corp.; Adversary 24-5208,

12   Despins v Zeisler & Zeisler P.C.

13          THE COURT:  Okay.  Good morning.

14          If we could have appearances for the record,

15   beginning with the Chapter 11 Trustee, please.

16          MR. DESPINS:  Good morning, Your Honor.

17          Luc Despins, Chapter 11 Trustee.  I believe that

18   one of the matters may have been left off, which is 5134,

19   Despins v Serta & Associates.

20          THE COURT:  That may be.

21          Good morning.

22          MS. MOFFET:  Good morning, Your Honor.

23          THE COURT:  Counsel, would you mind coming

24   forward, just because we can't hear you unless the microphone

25   picks up your voice for recording purposes.  Thank you.

1            MS. MOFFETT:  Yes, Your Honor.

2            I just wanted to note another adversary proceeding

3    that I believe was left off:  5 -- 24-5196, Despins v

4    Morvillo Abramowitz Grand Iason & Anello P.C.

5            THE COURT:  Okay.  Thank you.

6            MS. MOFFETT:  Thank you, Your Honor.

7            THE DEPUTY:  So, I'm sorry, I did not get the

8    attorney's name, please?

9            MS. MOFFETT:  Oh, I'm sorry.  My apologies.

10           THE COURT:  That's okay.

11           MS. MOFFETT:  Rowena Moffett, on behalf of the

12   adversary defendant I just mentioned.

13           THE COURT:  Thank you very much.

14           I think we have, maybe, other counsel that might

15   want to come forward?

16           MR. LINSEY:  I think, Your Honor --

17           THE COURT:  Just hold on a second, Attorney

18   Linsey.

19           MR. LINSEY:  Sure.

20           THE COURT:  I'll just hear from counsel first and

21   then we'll go from there.

22           MR. FEDER:  Yes, good morning, Your Honor.

23           Benjamin Feder of Kelley, Drye & Warren, appearing

24   on behalf of Indium Software, in the matter of Despins v

25   Indium Software, Number 24-05122.

 1                  THE COURT:  I don't think that matter was on this

 2     calendar.

 3                  UNIDENTIFIED SPEAKER:  (Indiscernible.)

 4                  THE COURT:  Yeah.

 5                  You're party to the joint brief, Counsel, your

 6     client, correct?

 7                  MR. FEDER:  Correct.

 8                  THE COURT:  Yeah, correct.

 9                  And I think Attorney Moffett's client is, as well.

10                  So, we're not calling all the adversary

11     proceedings that are parties to the joint brief.  What we did

12     at the status conference last week, and I'm not sure if

13     either of you were participating in that conference, we took

14     a list of all the parties that have agreed to be part of the

15     joint brief, and that's part of the record.

16                  But as far as today is concerned, for -- we put

17     the joint brief as one matter and then the other adversaries

18     that are called are not joint brief Defendants, okay?

19                  MR. FEDER:  Understood.  Thank you.

20                  THE COURT:  So it's not your -- it's a little --

21     it's a little confusing, obviously.  There's hundreds of

22     adversary proceedings.

23                  And so the other matters that are on the calendar

24     that are motions to dismiss or motions to dismiss for

25     judgment on the pleadings, are parties who are not joint

1  Defendants to the joint brief --

2            MR. FEDER:  Okay.  Thank you.

3            THE COURT:  -- and weren't subject to mediation,

4  essentially.

5            MR. FEDER:  Thank you for clarifying, Your Honor.

6            THE COURT:  Yes, believe me, I understand, okay.

7  So, thank you, though, both of you, and just so you know, you

8  are part of the argument today and your clients are part of

9  the list of the joint Defendants and you all signed on to the

10 joint brief.

11           MR. FEDER:  Okay.  Thank you, thank you, Your

12 Honor.

13           THE COURT:  Okay.  Thank you.

14           All right.  Go ahead, Attorney Bassett.

15           MR. BASSETT:  Yes, good afternoon -- sorry -- good

16 morning, Your Honor.

17           Nick Bassett from Paul Hastings, counsel for the

18 Chapter 11 Trustee.

19           THE COURT:  Good morning.

20           MR. LINSEY:  Good morning, Your Honor.

21           Patrick Linsey, Neubert Pepe & Monteith, counsel

22 for the Chapter 11 Trustee.

23           THE COURT:  Good morning.

24           MR. SARNOFF:  Good morning, Your Honor.

25           Stuart Sarnoff of O'Melveny Myers, on behalf of

1  creditor PAX.

2            THE COURT:  Good morning.

3            MR. GOLDSTEIN:  Good morning, Your Honor.

4            Eric Goldstein from Shipman & Goodwin, on behalf

5  of:  Anthem Health Assurance, Inc.; Anthem Health Plans,

6  Inc.; Cedric Realty Corp.; Direct Persuasion LLC; On the Spot

7  Home Improvement, Inc.; and Federal Express Corporation.

8            THE COURT:  Good morning.

9            MR. PETERSON:  Good morning, Your Honor.

10            Brian Peterson, K&L Gates, on behalf of

11  Amazon.com, Inc. and the Amazon Web Services, Inc.

12            THE COURT:  Good morning.

13            MR. LADDIN:  Good morning, Your Honor.

14            Darryl Laddin of Arnall Golden Gregory, on behalf

15  of American Express Company, one of the joint Defendants.

16            THE COURT:  Good morning.

17            You don't have to note your appearance if you're

18  one of the joint Defendants, but that's fine.  Thank you.

19            The reason I say that, Counsel, the only reason I

20  say that is we talked about who was going to make the

21  argument on behalf of the joint Defendants and yesterday, as

22  I requested, and it was done and I appreciate that.  There

23  was a document filed that Attorney Goldstein and Attorney

24  Peterson are going to be making the arguments on behalf of

25  the joint Defendants.

1            One of the reasons I did what I did last week with

2    the attendance was to make sure that all of the Defendants,

3    including your client, was part of the record.  And by

4    signing on to the joint brief, we will make certain that if a

5    transcript is required and requested, that all of the parties

6    that are parties to the joint brief, and their counsel, will

7    be listed as part of that proceeding.

8            MR. LADDIN:  Thank you, Your Honor.

9            THE COURT:  Okay.  Thank you.

10           MR. SKLARZ:  Good morning, Your Honor.

11           Jeffrey Sklarz, Green & Sklarz, for various non-

12   joint Defendants, as listed in the report filed by the

13   trustee.  I won't go through all of my Defendants at this

14   time.

15           THE COURT:  Thank you.

16           MR. SKLARZ:  Thank you.

17           MR. KINDSETH:  Good morning, Your Honor.

18           THE COURT:  Good morning.

19           MR. KINDSETH:  Stephen Kindseth, Zeisler &

20   Zeisler, for Zeisler & Zeisler.

21           THE COURT:  Good morning.

22           So, when we had our status conference last week,

23   we talked about the arguments that are going to be made

24   today, time limits on arguments, and Attorney Sklarz and

25   Attorney Kindseth were the two non-joint Defendants' counsel

1  who I allowed, because everybody made their statements last

2  week, to also make arguments at this hearing.

3          So the way that we will proceed is the way we

4  discussed last week, that the joint Defendants will make

5  their arguments, with regard to the issues that the joint

6  Defendants put forth for the Court back in September of last

7  year.  I actually looked back and saw if I had -- and I did

8  have, Attorney Goldstein, the document that you had submitted

9  to the Court at that time, that was the list of the issues

10  that the joint Defendants had agreed to argue.

11          And I wanted to just make sure that the language

12  that was in the order that was issued back after that status

13  conference, that set forth the four issues was the same and

14  it is actually the same.  I don't think there's any deviation

15  from the language that your -- you submitted on behalf of all

16  of the joint Defendants.  So I did go back and check that.

17          Obviously, as you all know, there are many, many

18  issues in all of these adversaries, but I did go back and

19  make sure that we, in the order, clarified -- not

20  clarified -- excuse me, that's the incorrect word -- included

21  the four issues that -- and it's based -- it seems, to me, to

22  be verbatim of the -- that the joint Defendants asked the

23  Court to consider as legal issues in connection with the

24  motions to dismiss or motions for judgment on the pleadings.

25          So, again, I appreciate that yesterday, a document

1  was filed that said that Attorney Peterson would address

2  Issues 1 and 3 and Attorney Goldstein would address Issues 2

3  and 4.  And that's how we would proceed.

4        I believe, but I will listen to any opinions to

5  the contrary, that given the four issues that the joint

6  Defendants put before the Court, that we should take them in

7  order, unless, somehow, Attorney Goldstein or Attorney

8  Peterson, you want to argue -- and I think Attorney Peterson,

9  you're 1 and 3, and Attorney Goldstein is 2 and 4.

10        MR. GOLDSTEIN:  Thank you, Your Honor.

11        Eric Goldstein.

12        The way that Attorney Peterson and I tried to

13  organize it so to have a, not a broken-up, disjointed

14  presentation, is if we could, have him do Issue 1 and 3 and

15  then pass to me to do 2 and 4.  We think we can do that in a

16  way that flows and makes sense and builds on each other and

17  it doesn't break up with us having to switch to the podium,

18  if that's okay?

19        THE COURT:  That's fine.

20        But I will watch your time, right, on each issue,

21  because we did talk about -- because I gave you 15 minutes

22  per issue and I gave the trustee half an hour to respond.

23        MR. GOLDSTEIN:  Understood.

24        THE COURT:  So, if you're going to do that,

25  Attorney Peterson, that's fine, but I will watch the clock,

1   okay, and I need you to be -- the issues that the joint

2   Defendants put together are four separate issues and you may

3   argue that 1 and 3 are connected.

4          Well, I think they're all connected, quite

5   frankly, so I'm not going to necessarily agree that you can

6   be arguing about 1 and 3 at the same time or if you do that,

7   I might not, you know, take all of that into consideration.

8   These are four legal issues that the joint Defendants

9   prepared and requested and that request was met by the Court,

10  to address as legal issues, okay.

11         So, if either of you have any questions about

12  that, just -- this would be the time to ask them.

13         MR. GOLDSTEIN:  The only clarifying question, Your

14  Honor, is to the extent that I take less than 15 minutes on

15  one of the issues, does that extra time get allotted to my

16  issues?

17         THE COURT:  I'm not sure.  We'll have to see how

18  that goes; how about that?

19         MR. GOLDSTEIN:  Okay.  All right.  Fair enough,

20  Your Honor.

21         THE COURT:  I don't have any lights or anything,

22  so I don't know that that -- but I understand your question

23  and we'll see how that goes.

24         MR. GOLDSTEIN:  Okay.

25         THE COURT:  Okay.  All right.

1          Then, Trustee Despins, is there any questions that

2   you have before we begin?

3          MR. DESPINS:  No, Your Honor.

4          THE COURT:  Okay.  Then, Attorney Peterson, please

5   proceed with Issues 1 and 3.

6          Oh, and may I say something, too, before anybody

7   starts.  I think you probably noticed, we don't need to talk

8   about standards on motions to dismiss and motions for

9   judgments on the pleadings.  This is just talking about the

10  legal issues, okay.  I did say that originally in the order,

11  but I want the record to be clear that no one is disputing

12  the legal standards with regards to motions to dismiss and

13  motions for judgment on the pleadings, okay.

14         MR. GOLDSTEIN:  I understand.

15         THE COURT:  All right.  So --

16         MR. GOLDSTEIN:  And I appreciate any guidance,

17  Your Honor.

18         THE COURT:  All right.  So it's 10:30, please

19  proceed.

20         MR. PETERSON:  Again, Your Honor, Brian Peterson,

21  K&L Gates, on behalf of Amazon.com, Inc. and Amazon Web

22  Services, Inc.

23         So, as we just discussed, I'll be addressing

24  Issues 1 and 3.  The first issue is whether the trustee can

25  avoid an initial transfer by a nondebtor entity.  Your Honor,

1   the joint Defendants filed their omnibus motion to dismiss

2   because we have a fundamental disagreement with the trustee

3   regarding the scope of his avoidance action powers.  We

4   believe that the trustee's claims under 548, 549, and 544

5   fail as a matter of law because they seek the avoidance of

6   transfers made by nondebtor entities.

7         We believe that the trustee's approach in these

8   alter ego -- in these avoidance action adversaries, Your

9   Honor, is overreaching and is not consistent with the

10  Bankruptcy Code.  Now, I do want to address one point that

11  the trustee makes in his brief, Your Honor, and that is, if

12  you were to rule in the Joint Defendants' favor, you would

13  somehow deprive the trustee of his recourse to remedy a

14  fraud.

15        We don't believe that's accurate, Your Honor.  The

16  trustee has recourse against the alter-ego entities

17  themselves and their assets.  The trustee also has recourse

18  against the principals of the alter-egos, to the extent they

19  aided and abetted any fraud, but more fundamentally, Your

20  Honor, the trustee's duty in this case is not to remedy a

21  fraud; the trustee's duty is to administer the bankruptcy

22  estate of Kwok in a manner that complies with the directives

23  of the Bankruptcy Code.

24        So, as we often do, let's start with the plain

25  language of the Bankruptcy Code.  Section 548 provides that a

1  trustee may avoid a transfer of an interest of the debtor and

2  property; similarly, Section 549 allows the trustee to avoid

3  a transfer of property of the debtor -- property of the

4  debtor.

5          Now, 5 -- excuse me -- a transfer of an interest

6  or property of the estate.  Property of the estate is defined

7  as legal or equity interests of the debtor and property, as

8  of the commencement of the case.

9          In turn, the debtor, under the Code, is defined as

10  an entity or a person that is subject to a case under you

11  Title 11.

12          544 reads the same and references, specifically,

13  the debtor.  It allows -- gives the trustee the rights of a

14  hypothetical lien creditor and grants the trustee the ability

15  to avoid a transfer of property of the debtor, that is

16  avoidable by a hypothetical creditor of the debtor.

17          The trustee's attempt to avoid transfers made by

18  nondebtor entities is important because it deprives the Joint

19  Defendants of their statutory defenses, including the

20  subsequent transfer of good faith to funds.

21          Now, Your Honor, what is the basis for the trustee

22  to make this distinction and overlook the plain language of

23  the Bankruptcy Code.  It's the trustee's position that the

24  alter-ego entities and the debtor are one in the same; that

25  the alter-ego determinations that this Court made convert

1   those entities into debtors under the Code.

2          And that's what we have a disagreement about, Your

3   Honor.  We disagree that the effect of those alter-ego

4   determinations was to convert them into debtors under the

5   Code.  And to that point, Your Honor, we don't believe that

6   we're asking you, in any way, to overrule any prior decision

7   you made, with respect to the nondebtor transferors and

8   whether or not they may be alter-egos.

9          The narrower issue before this Court that we're

10  here to address, and the issues that we have raised, is the

11  effect of those alter-ego determinations.  And the effect is

12  not to grant the trustee avoidance action powers, with

13  respect to transfers made by those nondebtor entities.

14         That brings us to Question 2, which is:  What is

15  the effect of the alter-ego or reverse veil-piercing

16  determination under applicable law?

17              THE COURT:  You mean -- it's actually Issue 3 --

18              MR. PETERSON:  Oh, yeah.  It's --

19              THE COURT:  -- just to be clear, for the --

20              MR. PETERSON:  Yes, it is Issue 3.

21              THE COURT:  -- your second argument, but just to

22  be clear for the record, okay.  Thank you.

23              MR. PETERSON:  Yes, thank you.

24              THE COURT:  Go ahead.

25              MR. PETERSON:  Thank you, Your Honor.

1            As a matter of law, the alter-ego determinations

2    does not give the trustee standing to avoid transfers of

3    nondebtors.  As we have set forth in our briefing, Your

4    Honor, at most, what that alter-ego determination does is it

5    results in vicarious liability against those alter-egos.

6            And we cited multiple decisions for this

7    conclusion: In re Stillwater, 559 B.R. 563; that's a

8    bankruptcy decision out of the Southern District of New York.

9    The Court rejected the alter-ego theory to selectively pool

10   assets of the Delaware entity with the debtor entity for

11   purposes of creating causes of action under 544.

12           And the Court specifically stated it knows of no

13   support for the idea that alter-ego theories can be used in

14   this selective and self-serving way.

15           That issue came before the Court on a Ms. Convoy's

16   and the Court granted the motion to dismiss.  Similarly,

17   in -- In re Wardle, the Ninth Circuit BAP decision, the Court

18   determined that --

19           THE COURT:  Can you spell the name of that case,

20   please, the one that you just noted.

21           MR. PETERSON:  The one I --

22           THE COURT:  Wardle.

23           MR. PETERSON:  Wardle?

24           In re Wardle, it's W-a-r-d-l-e.

25           THE COURT:  Thank you.

1          MR. PETERSON:  The BAP determined that the trustee

2    did not have standing to pursue Chapter 5 avoidance action

3    claims against a nondebtor -- or brought through a nondebtor

4    entity, stating:

5          "An alter-ego determination will not somehow

6    transmogrify the alleged alter-ego's funds into property of

7    the debtor's estate."

8          The Court noted:

9          "That unless there's substantive consolidation or

10   a bankruptcy petition filed by that nondebtor, there's no

11   corporate bankruptcy estate and, therefore, the trustee

12   cannot pursue 547 and 548 actions in the nondebtor's name."

13         We cited additional decisions, Your Honor, for the

14   same proposition:  In re Silver and In re Dumouchelle.  And

15   those are both bankruptcy decisions out of Michigan.

16         THE COURT:  I apologize.

17         Would you spell for the record, the second of the

18   two Michigan cases.  Like, silver, we've got, but ...

19         MR. PETERSON:  Yep, Dumouchelle.  It's D-u-m-o-u-

20   c-h-e-l-l-e.

21         THE COURT:  Thank you.

22         MR. PETERSON:  And in that decision, the Court

23   rejected fraudulent transfer claims based on transfers from

24   the Debtor's alter-ego company formed under Michigan law,

25   which applied the vicarious liability approach to alter-ego.

1       Your Honor, as stated in the court, in the <u>Pavers</u>,

2  which is a District Court case out of the Eastern District of

3  New York, just because two entities are alter-egos does not

4  make them both debtors under the Bankruptcy Code.  It simply

5  means they are liable for each other's debts.  That's at

6  page 51 of the decision.

7       Your Honor, the Joint Defendants do acknowledge

8  that some courts have recognized the "identity theory," and

9  in, <u>In re Howland</u>, the Sixth Circuit described how this

10  distinction between vicarious liability and identity theory

11  can be relevant to the determination of whether alter-ego

12  confers standing on a trustee.

13       There, the Court granted the Defendants motion for

14  judgment on the pleadings and the Sixth Circuit affirmed.

15  And the basis for the Court's ruling was that, and its

16  conclusion that an individual debtor, a trustee of an

17  individual debtor, could not avoid under 548, the transfer

18  made by a nondebtor alter-ego under a veil-piercing theory is

19  because the Court applied Kentucky law and it determined that

20  Kentucky law is a vicarious liability state.

21       Importantly, Your Honor, Delaware law, we believe,

22  applies a vicarious liability approach to alter-ego; in other

23  words, Delaware is not an identity theory state.

24       Before the hearing, Your Honor, in preparation for

25  this argument, we did discover that the Delaware Chancery

1  Court issued opinion -- an opinion in the middle of December,

2  just a month ago.  It's Gracey v Albawardi.

3          THE COURT:  All right.  Hold on one second --

4          MR. PETERSON:  Uh-huh.

5          THE COURT:  -- because that isn't in any of the

6  papers, then, correct?

7          MR. PETERSON:  Correct.

8          THE COURT:  All right.  So would you please spell

9  the names for the record.

10          MR. PETERSON:  Yeah, and we also have -- we have

11  copies of the case and we've already --

12          THE COURT:  Thank you.

13          MR. PETERSON:  -- provided them to opposing

14  counsel.

15          If I may approach, please?

16          THE COURT:  Yes, please.

17          But, again, when you have a chance, Attorney

18  Peterson, if you could just spell the name of the case for

19  the record, please, since this is not in any of the briefs.

20          MR. PETERSON:  Sure.  It's Gracey, G-r-a-c-e-y v

21  Albawardi, A-l-b-a-w-a-r-d-i.  And the Westlaw citation is

22  2024 WL 5116368.

23          Why do we think this decision is important and why

24  are we addressing it with you right now at this hearing?

25          Well, it's the Delaware Court's most recent

1  description of the effect of a reverse veil-piercing.  In

2  that decision, the Court considered the Plaintiff's request

3  for declaratory judgment, that certain entities were alter-

4  egos of Albawardi.

5          In describing the request, the Court said that

6  Gracey sought reverse veil-piercing, which the Court

7  described as, quote, "The imposition of liability on a

8  business uh organization for the liabilities of its owners."

9  And that statement is at the end of page 4.

10          Thus --

11          THE COURT:  What page, I'm sorry?

12          MR. PETERSON:  4.

13          THE COURT:  4?

14          MR. PETERSON:  That's the Westlaw page.

15          THE COURT:  Uh-huh.

16          MR. PETERSON:  So, Your Honor, we're citing that

17  decision as the most recent description of the effect of

18  veil-piercing under Delaware law, which we believe supports

19  our position that an alter-ego determination results in

20  vicarious liability.

21          We also --

22          THE COURT:  So, may I just -- I just wanted to

23  follow what you said about the Gracey --

24          MR. PETERSON:  Sure.

25          THE COURT:  -- because, obviously, I haven't seen

1    it until now, which is absolutely fine.

2              MR. PETERSON:  Uh-huh.

3              THE COURT:  I think what you're reading is, am I

4    correct, you're reading a paragraph that starts with the

5    number A -- with the number -- the letter A, alter-ego theory

6    liability, and it says:

7              "And in Count 1 of the amended petition --"

8              MR. PETERSON:  Uh-huh.

9              THE COURT:  -- "Gracey seeks declaratory judgment

10   that Dial and Dial subsidiaries --"  I don't even know if I'm

11   saying that properly, even -- "are alter-ego of Albawardi,

12   and, therefore, liable to her for all monies due and owing

13   under the judgment."

14             MR. PETERSON:  Uh-huh.

15             THE COURT:  And, then, I think this is the

16   sentence that you were just referring to, but I want to make

17   sure that it's the sentence, that is:

18             "Gracey seeks reverse veil-piercing -- quote, the

19   imposition of a liability on a business organization for the

20   liabilities of its owners."

21             MR. PETERSON:  Correct.

22             THE COURT:  Okay.  So the Court is just stating

23   what the cause of action is in that paragraph, correct?

24             MR. PETERSON:  We believe, Your Honor, the Court

25   is describing what the reverse veil-piercing is.

1          THE COURT:  Well, what is Footnote 58, apparently?

2    Let's see, I don't know.

3          MR. PETERSON:  That's a citation to Manichaean.

4          THE COURT:  Well, it cites to Manichaean, 58,

5    right?

6          MR. PETERSON:  Uh-huh.

7          THE COURT:  And then it says:

8          "As noted from the organizational chart above,"

9    which of course I haven't looked at yet, but it's there,

10   apparently, "the Dial entities are ultimately held through

11   trusts.  See super notes 24, 25.

12         Even if Gracey's claim were stronger, I would

13   hesitate to veil-pierce since any financial benefit Albawardi

14   derived from the Dial entities would seem to be as a trust

15   beneficiary, not as an owner of the Dial entities.  I need

16   not grapple with these complexities in any event, because

17   Gracey's claim is non-viable.

18         So, I don't know if it's really -- implement not

19   sure yet, because I haven't read the whole case.

20         MR. PETERSON:  Okay.

21         THE COURT:  But I'm not sure if the quote that

22   you're taking that from case, from the Gracey case actually

23   says what the status of reverse veil-piercing is.  It cites

24   to Manichaean Capital --

25         MR. PETERSON:  Yeah.

1       THE COURT:  -- which talks about reverse veil-
2  piercing and which finds that reverse veil-piercing is a
3  viable claim.  That's what _Manichaean Capital_ says.
4       MR. PETERSON:  I understand your point, Your
5  Honor, which is, you know, ultimately, in _Gracey_, it looks
6  like the Court did not allow the alter-ego claim to go
7  forward, right.
8       So, did the Court really need to make a legal
9  determination as to what the effect of veil-piercing would be
10 in that particular case, right?
11      Now, Your Honor, we believe that's the same as
12 _Manichaean_.  In _Manichaean_, the Plaintiffs in that case
13 actually sought to enforce a judgment or a charging order --
14      THE COURT:  A charging order, right.
15      MR. PETERSON:  -- against the alter-ego.  And the
16 Plaintiff wasn't seeking a determination that the entities
17 were one in the same for all purposes.  So any supportive
18 statement in _Manichaean_ was actually _dicta_ in that case, too.
19 So, if --
20      THE COURT:  But in _Manichaean_, the Court, the
21 Delaware Chancery Court was dealing specifically with
22 Delaware statutes, with regard to how the shareholders could
23 bring a cause of action for value of their shares under a
24 statute created by Delaware Legislature in order to avoid
25 the, essentially, stopping of a merger; isn't that true?  And

1  that's what happened in _Manichaean Capital_, that the

2  shareholder got its charging order --

3        MR. PETERSON:  Uh-huh.

4        THE COURT:  -- the company wouldn't -- the company

5  against whom they got the charging order wouldn't pay.

6        MR. PETERSON:  Uh-huh.

7        THE COURT:  That company was merged into another

8  company and they brought another cause of action, asserting

9  both, the alter-ego or reverse veil-piercing, both, to the

10  merged company and to the subsidiaries that were still in

11  existence from the company that merged from the new company.

12        MR. PETERSON:  Uh-huh.

13        THE COURT:  So, I -- but under Delaware, under

14  that case, they're not talking about things being held in

15  trust.  They're talking about corporate entities and merger

16  issues and specific Delaware statutes that deal with the

17  manner, the only manner in which, according to _Manichaean_

18  _Capital_, anyway, that shareholder could assert that they were

19  not being paid the value of their shares upon the merger.

20        MR. PETERSON:  I think in both instances, and the

21  reason, you know, our position, the Joint Defendants'

22  position with respect to both decisions, is in expressing

23  alter-ego and the relief sought, the Court's articulation of

24  that was in a description of that relief as a form of

25  vicarious liability, both in _Manichaean_, and in _Gracey_.

1          And understanding there could be limitations with

2     Gracey in terms of if the claim was not viable; ultimately,

3     that's what the Court determined.  But if we're going to look

4     to Delaware law to see how you courts have described alter-

5     ego, they have not described them as -- alter-ego theory as

6     an identity theory; instead, they described it as vicarious

7     liability and the way they've articulated it.

8          THE COURT:  But I don't -- you -- I haven't ready

9     copies of Gracey, but I didn't think they used the words

10    "vicarious liability" in Manichaean Capital.  And I could be

11    wrong, Counsel, so please correct me.

12         MR. PETERSON:  Well, I was planning on addressing

13    Manichaean later, but I'll address it now.  So, at its most

14    basic level -- this is the quote from the decision:

15         "Reverse veil-piercing involves the imposition of

16    liability on a business organization for the liabilities of

17    its owners."

18         That, Your Honor, that quote right there, that's

19    vicarious liability.

20         Now, what the trustee relies on is the second,

21    later sentence:

22         "In the parent subsidiary context, where the

23    subsidiaries and their alter-ego, the parent, the Court will

24    treat the assets of the subsidiary as those of the parent."

25         We think that that sentence is taken out of

1   context.  It's talking about the parent subsidiary scenario

2   and we believe that it's -- the Court is merely saying the

3   parent can look to the assets of the sub to satisfy the

4   liability.

5            In Manichaean, plaintiff's claim for reverse veil-

6   piercing, according to Court, sought to quote, "Hold source

7   HOV Holdings' subsidiary liable for its debts."  That's at

8   page 700 of the decision.  So they didn't seek consolidation

9   of the two entities for all purposes.

10            And so given the scenario, given the posture of

11  the case, any statement that the trustee is relying on, Your

12  Honor, is *dicta*.  That issue wasn't before the Court.  The

13  Court was determining whether it could hold an entity

14  vicariously liable.

15            In addition, it's contradicted.  That *dicta* was

16  contradicted by the Court's prior citation, Footnote 84.  And

17  there, they cite Sky Cable, a quote there that says, Reverse

18  veil-piercing attached is just liability to the entity for a

19  judgment against the individuals who hold an ownership

20  interest in the entity.

21            For all of those reasons --

22            THE COURT:  Footnote 84?

23            MR. PETERSON:  Footnote 84.

24            THE COURT:  Go ahead.  I just wanted to make sure

25  I got you properly.

1    MR. PETERSON:  One more point on man chemo, right,

2  is the Court, for the favorable quote that we believe is just

3  a straight sentence that the trustee takes out of context,

4  the Court cites to Spring Real Estate.  Spring Real Estate,

5  we believe, doesn't carry weight.  Spring Real Estate relied

6  on American International Refinery, and in that case, the

7  Court applied Nevada law, not Delaware law, and Nevada law,

8  more clearly, adopts the identity theory of alter-ego.

9    So, I'll go back to our previous discussion.  We

10  talked about Gracey and the effect of the alter-ego

11  determination.  Your Honor, the Joint Defendants believe that

12  RS Air, the Ninth Circuit BAP decision from 2023, speaks

13  directly to the issue.

14    THE COURT:  Would you spell that, again, I

15  apologize.  But it's helpful for the record.

16    MR. PETERSON:  Sure, Your Honor.

17    RS Air, LLC V NetJets Aviation, Inc. at 651 B.R.

18  538.

19    THE COURT:  Thank you.

20    MR. PETERSON:  Why is RS Air important?

21    RS Air is important because it's a BAP-level

22  decision and it's the most recent bankruptcy decision

23  discussing the effect of alter-ego under Delaware law.  Ninth

24  Circuit BAP determined the contours of the alter-ego doctrine

25  under Delaware law and the context of determining whether

1  certain creditors violated the discharge injunction by filing

2  a State Court action against the debtor's alleged alter-egos.

3           The Court said:

4           "Although the alter-ego doctrine requires a

5  showing that the two entities operated as a single economic

6  entity, the result is not to deem the entities the same, but

7  to hold one liable for the other's debts."

8           So, what is the Court saying in RS Air?  The Court

9  is saying in RS Air, that even if you have a nondebtor

10 determination -- a determination that a nondebtor is an

11 alter-ego, that alter-ego doesn't get the benefit of the

12 discharge injunction.  It doesn't magically become a debtor

13 entity.

14          For the same reason, Your Honor, we don't believe

15 that the trustee should be able to argue that these nondebtor

16 entities in this case magically become debtors and,

17 therefore, he has standing to assert alter-ego actions

18 against the Joint Defendants.

19          Additional decisions, Your Honor, that we cited to

20 support our conclusion, statements in Otto Candies and

21 NetJets Aviation v LHC Communications; that's a Second

22 Circuit decision stating that under Delaware law, the

23 distinction between the entity and its owner may be

24 disregarded and require an owner to answer for the entity's

25 debts.

1          *Wilson v Thorn Energy* and *BFI Waste Systems of*

2   *America, LLC [sic] v Shaw Environmental & Infrastructure,*

3   *Inc.*; all of those cases talked about the alter-ego

4   determination allows for a veil-piercing to hold another

5   entity vicariously liable for one's debts.

6          Now, Your Honor, I think that the trustee knows

7   that the weight of these decisions, *Wardle*, *RS Air*, *In re*

8   *Stillwater*, and especially in the bankruptcy context, all

9   lead and should lead this Court to the conclusion that he

10  does not have standing to pursue transfers made by nondebtor

11  entities.

12         And I see in the briefing, really, two arguments.

13  One is, well, federal common law should apply, not State law.

14  And the other is the trustee relies on additional authority,

15  but we think, Your Honor, is hardly distinguishable, is

16  *dicta*, or applies non-Delaware law, like, invalid law.

17         And, first, Your Honor, I want to talk about this

18  assertion that somehow federal common law applies.  We start

19  with *Butner*.  The property interests are created and defined

20  by state law and unless some federal interest requires a

21  different result.

22         More importantly, what if courts said in the

23  context of alter-ego claims, they've held that state law

24  governs, *In re 10th Avenue Distributors* [sic].  It is clear

25  that the contours of the alter-ego cause of action are to be

1   determined with reference to state law.

2         McElroy v FirstEnergy Corp. -- that's a Third

3   Circuit case -- the Court said the same.  The only federal

4   common law that could support the trustee's theory in this

5   case is substantive consolidation and that's not the claim

6   that the trustee has chosen to pursue.

7         The trustee fails to cite a single case in which

8   the Court has concluded that federal common law applies to

9   the alter-ego doctrine.  And Duckworth really sums it up:

10         "Piercing the corporate veil is a state law,

11   common, equitable remedy that has nothing to do with federal

12   bankruptcy law.  And it goes without saying, it is never

13   applied by State Court's in a bankruptcy context."

14         Now, the Court or the trustee, Your Honor, has

15   relied on statements and certain decisions saying, once a

16   state law interest is determined under non-bankruptcy law,

17   federal law determines whether such interests constitute

18   property of the estate.

19         Your Honor, that just means you look to the state

20   law first to determine the existence and the extent of a

21   property interest and then you look to the Bankruptcy Code

22   and bankruptcy law to determine whether some contrary,

23   whether the Bankruptcy Code mandates a different result.  By

24   way of example, 541 is broadly worded, but it also,

25   specifically, carves out certain property from property of

1  the estate:  retirement account funds, college savings funds

2  are not included as property of the estate.

3        Section 552 of the Bankruptcy Code allows the

4  debtor to exempt property from the bankruptcy estate.  The

5  bankruptcy filing itself doesn't create new property

6  interests or enhance existing state law interests.  All of

7  the decisions the trustee cites to, or many of them -- In re

8  Ground Round, In re Chardon, In re Nejberger, Nicole Gas

9  Production, Commodore Business Machines, and others, none of

10  those cases were alter-ego cases.  And in all of those cases,

11  the Court actually looked to state law to determine the scope

12  of the estate's interests in property.

13        Now, next, Your Honor, the trustee says that as a

14  consequence of alter-ego, even under state law, that there is

15  this merger of entities.  And we believe, Your Honor, that's

16  incorrect.  Because if you reach that conclusion --

17        THE COURT:  Would you repeat?  I'm sorry, I didn't

18  hear exactly what you said.  If you would say that again, I'm

19  sorry.

20        MR. PETERSON:  Sure.

21        Your Honor, in addition to arguing making the

22  federal law a common law argument, the trustee also says even

23  under state law, the results of the alter-ego determination

24  is to make the alter-egos one in the same with the debtor.

25        We disagree and we believe, Your Honor, if you

1  were to side with the trustee on that issue, you would have

2  to disagree.  All of the authorities we have cited in our

3  brief, especially the authorities that specifically discuss

4  the alter-ego determination in the context of bankruptcy.

5  That's In re Wardle.  It's In re RS Air.  It's In re

6  Stillwater.  It's Duckworth, as well.  All of these decisions

7  make it clear that the consequence of the alter-ego is not to

8  magically transmogrify property of a nondebtor into property

9  of the estate.

10          We discussed Manichaean; that's a case that the

11  trustee relies on.  In addition, the trustee cites to In re

12  Blatstein, a Third Circuit decision.  The Court never ruled

13  on the effect of alter-ego in that decision.

14          In re Palmieri is another case that the trustee

15  cites to.  This -- the Court's statement in that case was

16  pure *dicta*.  The Court said that if the trustee eventually

17  prevails on its claim, that will lead to the conclusion that

18  the debtor owned its home when it was transferred to his

19  girlfriend's company.

20          In addition, the Court never provided any citation

21  for that statement that the trustee relies on.

22          In re American International Refinery, as I

23  mentioned previously, I think, Your Honor, that case does not

24  control.  It applied Nevada alter-ego law, which clearly

25  adopts the identity theory.

1          ASARCO.  ASARCO, Your Honor, involved a suit

2    against an insider parent company of the debtor and the Court

3    in that case, we believe, Your Honor, got it wrong.  They

4    cited to Polly Petroleum as Delaware law, but Polly Petroleum

5    is a 1968 case.  It didn't concern avoidance actions and it

6    involved a Delaware entity suing another entity to exercise

7    control over a Mexican subsidiary to stop it from prosecuting

8    litigation.

9          I also didn't have any support for the statement

10   that the trustee relied on in that decision, so it was *dicta*.

11   In addition, the transfer at issue was by the debtor's

12   subsidiary or the immediate parent.  So all these -- the

13   companies involved were closely related.

14         Insiders were affiliates of each other and the

15   Court addressed the argument that this was effectively

16   substantive consolidation and said that there was no risk to

17   the subsidiary's creditors in the case.  So we think it was

18   wrongly decided under applying and wrongly applied Delaware

19   law, but it's also distinguishable for a number of reasons.

20         THE COURT:  I'm going to give you two more

21   minutes.

22         MR. PETERSON:  Okay.  Two more minutes.  I'll uh

23   go to my concluding thoughts, Your Honor.

24         The trustee's avoidance action powers are limited

25   to transfers by a debtor of their interest in property.  This

1  is the plain language of 548, 549, and 544.  The trustee has

2  chosen strategically to assert that nondebtor entities or

3  alter-egos of Kwok and claims that this means that they are

4  debtors, themselves.

5       That's not the case.  We're deprived of our

6  defenses.  If you were to rule in the trustee's favor.  And

7  it rejects and is in appear sit with Wardle, RS Air,

8  Stillwater, Pavers, In re Silver, In re Duckworth, all of the

9  bankruptcy decisions that discuss the issue, which we think

10  Your Honor should focus on.

11       Your Honor, the only decision, as far as the Joint

12  Defendants can tell where a Court applying Delaware law

13  specifically ruled that veil-piercing confers avoidance

14  action standing on the trustee, is the ASARCO decision that I

15  just discussed.  That's one.  One case.  That's it.  And we

16  believe Your Honor should reject that case.

17       In addition, the trustee doesn't cite a single

18  indication authorizing the trustee to avoid a 549 claim made

19  by a nondebtor under a veil-piercing theory under Delaware

20  law.  We put that in brief, in our brief, opening brief in

21  bold and there wasn't a specific response in the trustee's

22  brief to that argument.

23       We think you should rely on RS Air, Stillwater,

24  and rule that the trustee has failed to state a claim for

25  relief against the Joint Defendants.

1            THE COURT:  Thank you.

2            MR. PETERSON:  Good morning -- we're still

3    morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. PETERSON:  So, I'm going to take Issues 2

6    and 4.  Just as a shorthand, when I -- I'm going to use in my

7    presentation the phrase "nondebtor transferors," which is

8    referencing the handful of entities that are alleged to have

9    made transfers to the Joint Defendants.  So, rather than

10   spelling them out each time, I'm just going to use that as a

11   shorthand.

12           THE COURT:  Go right ahead.

13           MR. PETERSON:  Okay.  So, Issue 2.  Whether

14   applicable law allows to reverse veil-piercing or alter ego

15   determinations, I'm going to jump right into the Manichaean

16   decision that Your Honor was discussing with Attorney

17   Peterson.  That case wrestled with whether or not Delaware

18   would recognize a reverse veil-piercing claim and ultimately

19   concluded that, quote, "In limited circumstances and in

20   circumscribed execution, it would."  The Court reached that

21   conclusion by first can value-maximizing the courts that have

22   rejected it.  And they -- the Manichaean courts framed that,

23   the courts that do reject it as, you know, the concern was

24   that it would, quote, facilitate harm through judicial decree

25   to innocent shareholders and third-party creditors.

1        And the Manichaean Court characterized that

2   concern as well-founded.  It was a serious concern in

3   allowing the reverse veil-piercing.

4        The Court, then, continued in its analysis to look

5   at some of the other Court's decisions that have tried to

6   navigate this issue and recognize that there are some court

7   decisions out in the country where they say, Well, we'll

8   allow it.  We'll allow reverse veil-piercing in certain,

9   limited instances, where those risks to third parties don't

10  exist.

11       For example, the Manichaean Court looked to the CF

12  Trust, Inc. v First Flight case, which is a Virginia Supreme

13  Court decision, which allowed the reverse veil-piercing.

14       But the mean chemical Court, as they put it, they

15  said it required a claimant to, quote, demonstrate that

16  reverse veil-piercing will not cause harm to innocent

17  investors or innocent secured and unsecured creditors.

18       Taking a lead from that latter line of cases, the

19  Chancery Court said out of frame worked, a carefully

20  circumscribed reverse veil-piercing doctrine.  In doing that,

21  the Chancery Court warned that if appropriate standards were

22  not applied, reverse veil-piercing can, quote, threaten

23  innocent third-party creditors and shareholders and lead to a

24  host of unpredictable outcomes for those constituents -- for

25  these constituencies; page 714.

1          Thus, the Chancery Court held, also at page 714:

2          "Only in cases alleging egregious facts, coupled

3    with the lack of real and substantial prejudice to third

4    parties, should the Court even consider utilizing the reverse

5    veil-piercing doctrine."

6          So, it's your view that under the Manichaean

7    Court's circumscribed test or framework for reverse veil-

8    piercing, that it's a pleading requirement that there not be

9    real and substantial prejudice to third parties, such as the

10   target entity creditors.

11         Noting parenthetically, that in that Gracey

12   decision that Attorney Peterson was discussing, that very

13   recent Delaware Chancery Court case, among the numerous

14   pleading deficiencies that the Court identified there, one of

15   the issues that they cropped up was the risk of harm to third

16   parties.  In that instance, the Court -- and I know Your

17   Honor hasn't looked at it and will, but when you get there,

18   the Court talked about the fact that these subsidiaries, that

19   they wanted to pierce the veil into, where it involved in

20   decades' worth of real estate transactions, which raised the

21   specter of harm to third parties, as well as the ultimate

22   ownership involved people, other than the Defendant, so that

23   there could be impacts on the ultimate ownership through the

24   trust to these beneficiaries, who are other than the

25   Defendant.

1          So, again, it was identified as one, as among many

2   pleading deficiencies identified in the case.

3          So, turning to our case for the cases against the

4   Joint Defendants, the trustee is using the reverse veil-

5   piercing doctrine to create initial transferee avoidance

6   liability against the Joint Defendants.  We don't believe

7   that's allowed and consistent with the test set forth in

8   Manichaean, which says that you can only use the doctrine

9   when you're not trying to prejudice third parties.

10         So there's no allegations that third parties of

11  the nondebtor transferors will not suffer real and

12  substantial prejudice by use of reverse veil-piercing to

13  create avoidance liability here, nor could there be.  On the

14  very face of these claims that they're intended to create

15  millions of dollars of avoidance liability to the Joint

16  Defendants.

17         In addition, there's a more nuanced issue, which

18  again, Attorney Peterson touched on, which is that by trying

19  to use the veil-piercing doctrine to create initial

20  transferee liability, you're cutting off a subsequent

21  transferee defense that would be available if the claims were

22  being brought against the Joint Defendants as, subsequently,

23  transferees under 550.

24         So, I want to just address some of the responses

25  that the trustee has made to this interpretation of

1  Manichaean.  So, in the opposition, the trustee argues that

2  harm to third-party creditors is just a factor, it's part of

3  a balancing test and it's not dispositive.  Not even -- what

4  I think about it is a gating issue.

5          But that's not what the Court said in Manichaean;

6  rather, as noted just a second ago, they said only in cases

7  alleging lack of real substantial prejudice creditors, should

8  the Court even consider utilizing the doctrine.

9          The support for the trustee's position that it's a

10 factor as part of a balancing test, right, where they cite to

11 In re Petters Company, Inc. and Sky Cable, LLC -- and it's

12 Petters with two Ts, for the transcript --  that that --

13 those cases stand for the proposition that it's a factor in a

14 balancing test.

15         Well, those decisions were years before

16 Manichaean, right, and those were a bankruptcy decision from

17 Minnesota, a Fourth Circuit decision, where they were just

18 trying to divine what the Delaware Supreme Court might one

19 day say, because the Delaware Supreme Court hadn't said what

20 the reverse veil-piercing test would be.

21         And in Petters, in addition to Delaware law, they

22 were also applying Minnesota law.

23         But we now know the answer.  We know the answer

24 because they said it in Manichaean, right, about what the

25 test is.  And I guess if you step into the thinking in

1    _Manichaean_, they cite to _In re Phillips_ in that decision,

2    which is a Colorado Supreme Court case, 130 -- it's a

3    Colorado Supreme Court case, which held that the reverse

4    veil-piercing may only be employed when an equitable result

5    would be achieved.

6        And the Colorado Supreme Court said, when innocent

7    shareholders or creditors would be prejudiced by outside

8    reverse veil-piercing, an equitable result is not achieved.

9    And, note, that was one of lines of cases that _Manichaean_

10   kind of adopted its framework on where they recognize the

11   threat, they recognize the risk, but still said, Okay, as

12   long as we can isolate and know that that risk isn't going to

13   occur, well, then, we can allow the reverse veil-piercing

14   doctrine to go forward.

15       The other arguments that were raised by the

16   trustee is that it was -- that it's premature, right, it's

17   premature at this stage of the case.  Well, we view it, and I

18   think _Manichaean_ lays it out, but it's an element to be pled,

19   right.  It's a gating issue, whether or not you get to

20   reverse veil-piercing and it should be allegedly.  It should

21   be alleged under Rule 11 for facts sufficient to give rise to

22   a recognizable claim that's joint before we have to incur the

23   costs of litigation beyond the pleading stage, and they have

24   not done so.

25       The other argument that's made is that, well, you

1  know, the Joint Defendants are not going to suffer any harm

2  here because they could file claims under 502(h).  Well,

3  that's -- they're not offering that they'll be able to refund

4  all the money, plus interest to account for the time value.

5  And we all know that the timing of any recovery is likely

6  years' away and the quantum, wholly uncertain.  So, just

7  monetarily, that's not a satisfactory response to the real

8  prejudice that the Joint Defendants would fair.

9           And then there's that more subtle issue, right,

10  which is we're being -- by trying to use alter-ego to create

11  initial transferee liability, we, then, would be losing the

12  carefully-balanced defenses that Congress set out in 550 for

13  subsequent transfers, where we'd be able to talk about good

14  faith and value as a defense.

15           So, you know, the allegations of real and

16  substantial prejudice to third parties is a gating issue

17  under Delaware law, for the imposition of the equitable

18  doctrine of reverse veil-piercing against the Joint

19  Defendants.

20           The complaints against the Joint Defendants do not

21  allege the absence of real and substantial prejudice, and

22  they can't, because the whole idea is to impose prejudice on

23  the trade creditors by making them targets of these initial

24  transferee alter-ego claims and taking away their 550

25  defenses as a subsequent transferee.  So, on this ground

1  alone, we think the motions submitted by the Joint Defendants

2  should be granted.

3         And with that, I'm going to pivot to Issue 4.

4  Okay.  So Issue 4 is whether a determination of reverse veil-

5  piercing on -- or alter-ego may be applied retroactively.

6  And when I am addressing this issue, I'm just going to assume

7  for the sake of argument, right, that let's say they can

8  allege a viable, reverse veil-piercing claim under Delaware

9  law and let's assume Delaware is identity theory, okay.

10        Well, even so, the alter-ego doctrine can't be

11  applied retroactively to allow the trustee to assert these

12  initial transferee avoidance claims against the Joint

13  Defendants.  They're trying to treat transfers from nondebtor

14  transferors, as (indiscernible) the debtor, even though these

15  occurred years before any rulings just regarding their

16  corporate form.  That is, what the trustee is trying to do

17  here is merge the nondebtor transferor's assets, right, into

18  one unified estate with the debtor retroactive to the

19  petition date for these 549 claims, and retroactive back to

20  further in time for these fraudulent transfer claims.

21        And from that unified set of assets, claims would

22  be paid of creditors, including the Joint Defendants' 502(h)

23  claims against this unified estate.

24        Well, in my mind, what that is, in essence, is

25  substantive consolidation.  And I think the case law, because

1  the result is the same, right.  You're pooling assets and

2  pooling liabilities into one unified estate.  Because the

3  outcome is the same, I think the case law governing

4  substantive consolidation retroactively, *nunc pro tunc*, is

5  helpful to look at, right.  It provides us some guideposts.

6        And that's really -- we could start with the DC

7  Circuit's seminal decision in Auto-Train, where it observed

8  that, in addition to the very difficult tests that have been

9  set out in, you know, in Augustino and in Auto-Train and in

10  other cases for substantive consolidation, you need to take

11  an additional and slightly different balancing test to avoid

12  havoc that you would wreak on creditors by retroactively

13  changing what a petition date would be.

14        So, in Auto-Train, the facts are, you know, we

15  should revisit it because there's analogies to this case.

16  So, in Auto-Train, the debtor filed in September 1980 and its

17  subsidiary, Railway Services Company, had made transfers to

18  Midland Ross in June and July of 1980.

19        In November 1980, the trustee for Auto-Train

20  obtained a substantive consolidation order, substantively

21  consolidating Railway into Auto-Train's bankruptcy case and

22  did so *nunc pro tunc*, back to September 8th, 1980.

23        So, what does that do?  That makes the transfers

24  to Midland Ross into the preference period.  So Midland Ross

25  challenged on appeal the proprietary of using *nunc pro tunc*

1  substantive consolidation to create this avoidance liability

2  under 547.

3         And the trustee in *Auto-Train* asserted that the

4  *nunc pro tunc* order, just like the trustee here, quote:

5         "Merely caused the record to reflect a fact that

6  already existed; namely, that Railway had no existence

7  separate from *Auto-Train*."

8         The D.C. Circuit rejected that argument and it

9  explained that, quote -- and this is at page 276:

10         "Even if the Bankruptcy Court's finding on this

11  issue sufficed for purposes of consolidation, they do not

12  justify putting a *nunc pro tunc* spin on the order.  Here, in

13  fact, we believe that the *nunc pro tunc* feature prejudices

14  Midland Ross in a manner contrary to the purposes of the

15  Bankruptcy Code."

16         The Court went on to, then, explain that the

17  problem with the trustee's position is that it requires

18  transferees to disgorge solely on the basis of a bankruptcy

19  filing by their -- the debtors' apparently distinctive

20  affiliate, which undermines some of the Code's core policies,

21  right.  Those core policies were to incentivize creditors to

22  continue to deal with troubled entities, right; the

23  financially distressed entities or affiliates of financially-

24  distressed entities and not have a rush to the courthouse,

25  right, to try to get at their assets because if there's a

1   fear.

2              That they wouldn't be able to pay.

3              So the argument that the D.C. Circuit rejected in

4   Auto-Train is the argument that we're hearing today, but it's

5   just being done under the banner of alter-ego, right; we're

6   just changing the names.  But the clash with the policies of

7   the Code are even more stark; particularly, even these 549

8   claims, and I want to talk about that.

9              So you're running, still, headlong into that same

10  issue, which is you're disincentivizing creditors from

11  dealing with nondebtor affiliates, you know, and this rush to

12  the courthouse.  But it also clashes with specific parts of

13  the Code.

14             If the -- it robs the Joint Defendants of that

15  ability to have come before this Court and obtained an order

16  under 363 that, well, what, with the transactions that they

17  had were being asked to engage in were approved or ordinary

18  course, and if they didn't get such relief from this Court,

19  they could have stopped U.S. Trustee doing business and not

20  exposed themselves to risking liability.

21             In addition, you've got the subsequent transferee

22  defenses, which are now being removed, but that's not all.

23  If you look at 549(b), which is a protection for creditors

24  who deal with the debtor during a gap period, between an

25  involuntary filing and order for relief, 549(b) says, Look,

1  those transferees, they're not going to have any risk.  They

2  won't have any liability, even if they know of the

3  involuntary case, for the transfers, manufactured that

4  they're giving value.

5         So the Bankruptcy Court clearly offers protections

6  to creditors that dealt with the debtor.  They knew this is a

7  debtor, subject to an involuntary case, but under the

8  trustee's view, the Joint Defendants, who are not alleged to

9  have any notice if Mr. Kwok's bankruptcy case or connections

10  between the nondebtor transferors and Mr. Kwok, they have

11  liability under 549 and they have no such protections that

12  would be offered to, you know, if the transferees knew of a

13  case of involuntary.

14         Finally, unlike Midland Ross and Auto-Train, which

15  it would have had a robust set of defenses under 547(c),

16  those similar types of defenses don't exist under 549.  So,

17  the concern that was dug up in Auto-Train, which that the

18  D.C. Circuit rejected, is apparent here.  It's just under the

19  banner of alter-ego.

20         And, utility, you find the transferees, the Joint

21  Defendants' are in an impossible situation, right, in the

22  sense that they would have no way of knowing that the entity

23  that they're dealing with is really, actually, an entity in

24  bankruptcy.  And this is an observation that Judge Kaplan

25  made in the Oncology Associates of Ocean County case.  That

1   was a case where a 549 whose claim was brought based on a

2   transfer of a nondebtor affiliate and the transfer was made

3   between the affiliate's bankruptcy filing and a substantive

4   consolidation order.  So the transfer happened between those

5   two dates and the substantive consolidation order wasn't *nunc*

6   *pro tunc* in the case.

7           And Judge Kaplan, you know, in rejecting the 549

8   claim, pointedly observed that, quote:

9           "One wonders how any attorney could counsel the

10  transferees to the risks associated with post-petition

11  transfers, where the transferor wasn't in bankruptcy."

12          So, what's the response we get to this from the

13  trustee?  Well, the trustee says, you know, this is a strong

14  man argument because alter-ego is different.  And for this

15  proposition, the trustee cites to In re Star Mountain

16  Resources, which does have a discussion of differences

17  between substantive consolidation and alter-ego in its usual

18  sense.

19          But Star Mountain goes on to explain that in Star

20  Mountain, importantly, it was a Nevada case, so they applied

21  that identity theory.  They explained in Footnote 86, as

22  follows:

23          "An alter-ego claim has a different effect in the

24  bankruptcy context than in the traditional civil trial

25  setting, where a specific creditor brings a judgment against

1   the alleged alter-ego.  An alter-ego finding in bankruptcy is

2   more similar to substantive consolidation, bringing the

3   assets of the alter-ego into the debtor's estate to be shared

4   collectively with the debtor's creditors."

5            And then the Court went on at page 7 of the

6   decision to just characterize the ultimate relief in that

7   case, where using alter-ego with Nevada law as being similar

8   to substantive consolidation.  The only distinction that the

9   Court made in Star Mountain was that it said that trying to

10  do substantive consolidation after you've confirmed a plan,

11  you have to cut off the rights there.  So you can't do

12  substantive consolidation after you've confirmed a plan, but

13  alter-ego can live on; you can preserve that.  That was the

14  only difference.

15           So if the result is the same, why apply a

16  different set of rules, right; the two equitable doctrines

17  being used to achieve the same purpose, to me, it does not

18  make any sense.  And, in fact, if you accept that, we could

19  just slap the label "alter-ego" on this equitable relief and

20  you disregard the protections that would have been afforded

21  if you were using the substantive consolidation doctrine.

22  Well, then, nobody is going to use substantive consolidation;

23  you'd just always use alter-ego because it'll be easier.

24           So -- but let's not stop there.  Let's look at,

25  now, the alter-ego cases and there's not a lot of them.  This

1   is fairly novel, but there are a few.  And the few that there

2   are, there's none, not a single one in this country that

3   allows a finding that a nondebtor as an alter-ego

4   retroactively create 549 liability.  There's not one, I've

5   looked.

6          So, let's start with the Duckworth adversaries,

7   which Mr. Peterson talked about.  And it's worth a quick dip

8   into the facts in Duckworth.  So the debtor, who was a grain

9   for farmer, right, and he had a significant secured bank debt

10  that was secured by his crops.  And what the guy did is he,

11  leading up to the year or so before his filing, he created a

12  column of LLCs to defraud his creditor.  He created these

13  LLCs to use them to trade grain -- to sell his crops or to

14  sell his grains, without freeing it of the bank's liens to

15  keep the proceeds.

16         And then, having done that, in the weeks before

17  filing Chapter 7, he took the money from those LLCs, created

18  a new LLC called "Power Trading," put the money into there,

19  filed Chapter 7, and then used the money in Power Trading to

20  pay for his personable expenses post-petition.

21         Okay.  So in the first adversary proceeding

22  against Casey's General Store, the trustee sought to avoid

23  about 70 post-petition transfers that went from Power Trading

24  to Casey's General Stores.

25         Like the trustee here, the Duckworth trustee's

1  theory uh no the 549 liability was premised on the use of the

2  alter-ego doctrine to write to combine the assets of Power

3  Trading with those of the debtor.  And so, because Power

4  Trading was in Indiana, a limited liability company, the

5  Bankruptcy Court started its analysis using Indiana

6  principles governing alter-ego.  And it framed out why this

7  was happening, you know, why was the trustee using a state

8  law equitable remedy to assert a 549 claim, as opposed to

9  doing a 548 claim against the subsequent transferee.  And

10  reason was to strip Casey's of its subsequent transferee

11  defenses under 550, right, which the Court refused to do.

12          Now, I want to pause here for a second because the

13  trustee tries to distinguish Duckworth by saying that, well,

14  there were no facts in that case that would cause the Court

15  to disregard the Corporate Forum of Power Trading or that the

16  trustee didn't dispute that Power Trading was a validly

17  formed, under state law, and thus, couldn't prove an alter-

18  ego on that ground.

19          I think that's a wrong reading.  First, the

20  reference to power trading existing and being formed under

21  state law, it's just that; it was formed under state law,

22  just like every single one of the nondebtor transferors.

23  They were formed under state law.  They made them register to

24  do business in the state.  They submitted their filings with

25  the Secretary of State.  Like, that's what the Court is

1   referencing there.  And that no decision at the time of the

2   transfers had rendered, to me, to strip them of their

3   Corporate Forum.

4          Second, the Court acknowledged at page 7 and

5   Footnote 12 of that decision, and we actually pulled up the

6   judgment and attached it as Exhibit A to our reply, that, in

7   fact, the Corporate Forum of Power Trading had been

8   disregarded, because the remaining assets in the bank account

9   that he had put into Power Trading were brought back in.

10  They were turned over to the estate at a prior -- not in the

11  same adversary proceeding; in a different one.

12          So -- and it really wasn't a close call, right.

13          THE WITNESS:  That this was an alter-ego.  I mean,

14  Duckworth conceded he had full dominion and control.  He was

15  using it to pay his personal living expenses.  It was to use

16  to provide asset protection and hide his assets, and he

17  ultimately entered a guilty plea and it's a lot of

18  similarities to what we're dealing with here.

19          So, the problem that the Court had in Duckworth

20  was taking that doctrine, that equitable doctrine to create

21  549 liability, it was extending it.  It had no problem

22  bringing the assets from Power Trading into the estate.  It

23  was extending it to create this 549 liability.

24          And I just want to put a few parts from the

25  Court's decision at page 8, which are telling.  First, the

1   Court says, You've got to approach -- you've got to prove,

2   when you're using alter-ego with a Bankruptcy Court-type

3   claim like this -- let me just queue up the quote:

4           "As such, extreme caution is warranted when a

5   Bankruptcy Court is asked it apply the remedy in the context

6   of a bankruptcy cause of action, such as that created

7   by 549."

8           Then two sentence later, the Court says:

9           "Here, the trustee contends that the alter-ego

10  doctrine may be used to recreate a different set of facts, to

11  rewrite history, so to speak, for a purpose cognizable only

12  under the bankruptcy law.  No state law corollary to deprive

13  a Defendant of the statutory good faith transferring defense,

14  provided by Section 550(b)(1).

15          In this Court's view, adopting the trustee's

16  theory will constitute a gross overextension of the alter-ego

17  doctrine, far beyond its identifiable state law parameters

18  and purposes."

19          The Duckworth Court had a chance to think about

20  this and reconsider its decision, because seven months later,

21  there was another adversary proceeding that came up for

22  decision in Big Al's Speakeasy, which was another trade

23  creditor that the debtor had been spending money from the

24  Power Trading account with.

25          But the Duckworth Court, and this is a 2013

1   decision, again, refused to reconsider its decision; again,

2   rejected the use of the alter-ego doctrine and went on to

3   explain that you can't use an equitable remedy to strip

4   people of their statutory rights, which is exactly what the

5   trustee was trying to do, expunge a 550 defense.  And

6   observing that no Federal Court has permitted this doctrine,

7   the doctrine of alter-ego to be used for that purpose.

8           The Court also rejected the fact that it could be

9   justified on the basis that they would be bringing in assets

10  to benefit creditors, that that wasn't a reason to strip

11  people of their rights to a subsequent transferee defense.

12          So again, this is what's happening here:  same

13  thing.  And as Duckworth observed and as we hope this Court

14  would observe, is that it should remain an unprecedented

15  legal theory.

16          Beyond that case, there's also the Lawler case,

17  which we also cite in our brief, which I'll just touch on

18  very briefly.  That is not an avoidance action case, but it

19  was whether or not -- what happened in that case is that

20  there was a bankruptcy filing.  About eight months later, a

21  mortgagee went to foreclose and sale property that was owned

22  by the Debtor's brother in a Family Trust and that

23  foreclosure sale went forward.

24          But, then, a few years later, the Bankruptcy Court

25  held that a trust that owns half that property was an alter-

1  ego of the debtor since its conception.  And on the strength

2  of that ruling, the debtor, then, brought claims saying,

3  Well, look, we need to avoid that foreclosure sale because it

4  was selling property that was -- it violated the stay because

5  if the trust is me, is the debtor, that's -- I have an

6  ownership interest and the foreclosure sale violated the

7  stay.

8         But the Court refused to do so on the basis that

9  today's would work an injustice against the foreclosing

10  mortgagee, who's entitled to rely on the separateness of the

11  trust at the time.

12         So the last things I draw, at least, from

13  Duckworth and Lawler are quite simple, right.  The equitable

14  doctrine of alter-ego cannot be used to retroactively create

15  liability under the Bankruptcy Code against non-insider

16  creditors.

17         And so, my fault, my time --

18         THE COURT:  No, you still have time.

19         MR. GOLDSTEIN:  All right.  I only need to address

20  a couple of other things, then, real quickly about with the

21  trustee's argument in my few minutes that remain.

22         One, they say that, well, look, an alter-ego

23  finding, you're an alter-ego for forever, right.  If you're

24  an alter-ego now, you've always been an alter-ego and there's

25  no *nunc pro tunc*y thing about this.  Well, one, I don't think

1   that that's inconsistent with <u>Auto-Train</u>, inconsistent with

2   <u>Duckworth</u>, inconsistent with <u>Lawler</u>.

3          But the citation for that is in <u>Adler</u>, this <u>Adler</u>

4   decision.  It was a Bankruptcy Court decision of the Eastern

5   District of New York in 2013.  That was a 720 --

6          THE COURT:  Is <u>Adler</u>, A-d-l-e-r?

7          MR. GOLDSTEIN:  Yes.  Sorry.  I'm sorry, A-d-l-e-

8   r.

9          THE COURT:  No, no,  that's fine.  Go ahead.

10          MR. GOLDSTEIN:  That was a 727 case.

11          So the issue there was that the debtor had us

12   quote five or so closing of corporations and that were

13   ultimately determined to be the debtor's alter-ego.

14          But the legal issue at play there didn't impact

15   third parties; it impacted the debtor.  And if the debtor was

16   using its closely-held companies for shenanigans, that

17   violated 727.  That was the legal issue at play, there.

18          Second, I mean, there are some statements in <u>Adler</u>

19   that other courts have taken issue with.  And that was, there

20   was a decision from the District Court for the Eastern

21   District of New York, which was cited by Mr. Peterson, the

22   <u>Pavers</u> case, which is 536 B.R. 48, which disagreed with such

23   a broad view of the alter-ego concept and said, quote:

24          "Just because two entities are alter-ego doesn't

25   make them both debtors under the Bankruptcy Code; it simply

1  means they're liable for liable for each other's debts.  If

2  the nondebtor wants the protection, it needs to file its own

3  petition."

4         So, I think, one, _Adler_ comes up in

5  extraordinarily different circumstances.  It didn't even

6  involve third parties; it just involved the debtor and a 727

7  case.  And some of its broad language has been criticized by

8  the District Court in the Eastern District of New York.

9         So the other cases cried by the trustee do not

10  disturb the conclusion that you can't use alter-ego to marry

11  together with this initial transferee avoidance liability

12  theory.  First off, as we've said, there's not a single case

13  in this country where a Court condoned the trustee's use of

14  alter-ego to create, after-the-fact 549 liability against a

15  non-insider.  And, second, of all the cases they've cited,

16  there is only one case that is even arguably against a non-

17  insider, arguably, and I'll get to why it's arguable.

18         The rest of them all are insider cases; it's

19  transfers to the spouse, the girlfriend, the best friend.

20  It's shenanigans like that.  And this distinction between

21  insider versus non-insiders is crucial.  See, it's the

22  protection of the non-insider third-party creditors that kind

23  of animates the Court's rulings in _Auto-Train_, _Duckworth_, and

24  _Lawler_.  There, they're trying to protect the trade

25  creditors' reliance interests that they were dealing with

1   distinct, nondebtor entities, right, that that should be

2   protected.

3        On the other hand, that's not true if you're

4   dealing with an insider who's either involved in the scheme

5   prepetition or certainly knew about the debtor being in

6   bankruptcy post-petition.

7        The reason I say, "arguably, about the one case

8   that they say is against non-insiders, that's the American

9   International Refinery case.  Just two quick points about

10   that and I'm going to, then, conclude, just to be mindful of

11   my time.

12        One -- the first issue on that, that that's not

13   a 549 case.  That is only a 548 case.  There's some stray

14   references in the Court's decision to Sections 547 and -549,

15   but the transfer that was being challenged there was only a

16   prepetition transfer.  There's -- the impact of the post-

17   petition transfer that's discussed in that case was expressly

18   approved by the Bankruptcy Court, so that is not a 549 case.

19   It is a fraudulent transfer case.

20        Second, there's a little bit less of an arm's-

21   length relationship with the transferee there, but long story

22   short, the transferee there, what they wound up doing is they

23   became partners.  They bought the stock owned by the debtor

24   subsidiary, who they said was an alter-ego of the debtor.

25   That subsidiary owns 100 percent of an entity that had gas

1  interests in Kazakhstan.  They sold 85 percent to the

2  transferee bridge and kept 15 percent.  So the two of them

3  remain partners in the venture and the transferee was

4  supposed to have gotten a bunch of financing to support the

5  venture.

6        And, secondarily, they hired the CEO, the

7  president of the debtor to come onboard after about a year

8  after the fact.  So, whether they were truly arm's-length is

9  questionable.  So, I'm going to conclude there.

10        There's a through-line in the decisions

11  surrounding reverse veil-piercing and Manichaean retroactive

12  substantive consolidation in Auto-Train, and their

13  retroactive application of the alter-ego doctrine to create

14  an additional transferee avoidance in Duckworth.  That is --

15  these extraordinarily and sparingly used equitable remedies

16  cannot be used to prejudice third parties and there are

17  reasonable expectations of dealing with separate and distinct

18  entities.  And they certainly cannot doze through in a manner

19  that's contrary to the (indiscernible) policies, such as

20  undermining the incentive to continue to transact with

21  distressed companies or even their affiliates, or in a manner

22  to strip these third parties of their rights they would have

23  under the Code:  seek a comfort order under 363; have a

24  subsequent transferee defense under 550.

25        Because there's no allegations the Joint

1   Defendants were insiders.  There's no allegation that they

2   were anything more than trade creditors who sold goods and

3   services to the nondebtor transferors.

4           The trustee should not be able to employ the

5   alter-ego finding retroactively to create an additional

6   transfer of liability.  And on that ground, we believe the

7   motion should also be dismissed.

8           So, I went about a minute over and I appreciate

9   your indulgence.  Thank you.

10          THE COURT:  Thank you very much.

11          Attorney Sklarz?

12          MR. SKLARZ:  Good morning, Your Honor.  Jeffrey

13  Sklarz.

14          THE COURT:  Good morning.

15          MR. SKLARZ:  The extraordinary relief that the

16  trustee is seeking is certainly not typically; essentially,

17  it amounts to a request to amend the 2022 bankruptcy

18  petitions to include new debtors that have never filed

19  bankruptcy under the Bankruptcy Code.

20          This is not typical retroactive relief.  In prior

21  hearings, Your Honor has mentioned, well, you enter a

22  judgment on a breach of contract action today, but it relates

23  to a breach in 2017.  This is more akin to you enter an order

24  today, but find everybody in contempt for violating that

25  order because they should have known about it back in 2017.

1        The trustee seeks to turn back time.  In the

2   briefing in my clients' cases, we refer to this as the "time

3   travel theory" to effectively amend all the bankruptcy

4   petitions to include all of the nondebtor transferors, as if

5   there were dozens of petitions filed then.

6        Only Mr. Kwok and shortly thereafter, the Genever

7   Company filed bankruptcy.  There is not a single nondebtor

8   transferor that has a bankruptcy petition, bankruptcy

9   schedules, statement of financial affairs.  There's been no

10  341 meeting or any of the other protections afforded to

11  creditors or parties in interest under the Bankruptcy Code.

12        And as Counsel has said, as the Supreme Court has

13  said, as innumerable courts have said, as Your Honor has

14  said, we start with the Code.  There are two sections ensure

15  the Bankruptcy Code that govern petitions:  301 and 303.  301

16  is involuntary; it is voluntary petitions.  You file one.

17  There is no petition for these entities.

18        If the trustee has always been the trustee of

19  these entities, as he claims, where's the petition?  Where's

20  the schedules?  Where's the identification of the assets of

21  each of the entities?  If the trustee has always been the

22  trustee of these supposed debtors, he hasn't done any of the

23  requirements under the Bankruptcy Code.

24        The other option is -- is an involuntary case

25  under 303.  There, it's a very reticulated scheme.  First,

1 you file an involuntary petition, alleging that a debtor

2 should be in bankruptcy and there is a process and, in fact,

3 under 303 and related statutes, how creditors are treated

4 during the gap period is of particular concern, as noted by

5 counsel.

6 The trustee simply cannot rewrite the petitions to

7 say everybody knows they've always been in bankruptcy.  That

8 is precisely the opposite of what Auto-Train permits.

9 Recasting the claims as anything other than substantive

10 consolidation, is a facade.

11 For example, if all the debtors, if all the

12 nondebtor transferors were, in fact, debtors as of 2022, why

13 did the trustee need to file hundreds of applications for

14 Rule 2004 exams?  He should have just gotten the documents

15 from his constituents.

16 If he already controlled the entities, he didn't

17 need to do any of that.  He didn't need to file the omnibus

18 alter-ego case.

19 There's no provision that affords the relief under

20 the Bankruptcy Code that the trustee seeks.  As stated, the

21 trustee lacks standing.  The joint Defendants have argued

22 this.  I won't go through it again, other than to note that

23 it has been said over and over again, and I think very well

24 in the Picard v JPMorgan case, 464 B.R. 84, 92.  It is

25 settled law that that precludes the trustee from, quote,

1   effectively stepping into the shoes of Mr. Kwok's actual

2   creditors, for purposes of pursuing the common law claims

3   against the debtors.

4           It's because if Kwok -- Kwok can't sue himself for

5   being an alter-ego.  It wouldn't make sense.  It's not an

6   asset of the bankruptcy estate.  It's not -- there's no

7   standing under 541 for these types of claims.  The only basis

8   would be under 544, and as Counsel said, that doesn't work.

9           Further, Your Honor, given how the trustee seeks

10  to reorder the assets and the capital structures of the

11  nondebtor transferors, policy considerations are of great

12  concern.  And this was well-stated in the Manichaean decision

13  where the Delaware Court of Chancery really struggles over

14  this remedy.

15          And as an initial note, what's odd about this case

16  and makes it completely different than any other alter-ego,

17  alleged alter-ego case that I've been involved in or I've

18  seen in the briefing, the misconduct by the bad actor,

19  Mr. Kwok, augments his estate.  So he stole from the alter-

20  egos.

21          The complaints the trustee filed say he used these

22  alter-egos, these nondebtor transferors, so enrich himself.

23  He bought Ferraris.  He bought homes.  He took money and

24  brought it and used it for his personal use.  That is an

25  augmentation of the estate.

1          In Mankassian (phonetic) or <u>Manichaean</u> -- I

2   apologize, I always mispronounce this case --

3          THE COURT:  I'm not exactly sure what the exact

4   pronunciation is, either.

5          MR. GOLDSTEIN:  -- as well as <u>Gracey</u> and any of

6   the other reverse veil-piercing cases, it's the opposite.

7   There's a diminution in the estate.

8          In the Mankassian, the debtor entity that the --

9   what was the subject of the minority oppression rights, the

10  buyer schemed to make money bypass that target acquisition

11  vehicle so that it didn't have to pay the Plaintiffs.

12         Here, if money is recovered from the nondebtor

13  entity creditors which, for the most part, are ordinary

14  course transferees or my clients are ordinary course

15  transferees or law firms, then that's benefiting someone who

16  never received any benefit of those services.

17         There was -- there would be a further augmentation

18  of the Kwok estate at a time when there's already been money,

19  allegedly, stolen from these nondebtor transferors by Mr.

20  Kwok.  So it's multiple dipping.  There's no connection

21  between the harm and the remedy; it's an inversion.  It would

22  further diminish an estate that was already diminished by

23  Mr. Kwok.  His estate is better off having committed the

24  fraud.  He can't -- the trustee can't, then, double-dip that

25  way.

1           Again, going back to the specific Code, with

2    respect to the 549 claims, it speaks specifically to

3    transfers of the estate.  It doesn't -- and to have an

4    estate, you need a bankruptcy.  So, going back to my initial

5    argument, no petition, no estate, no bankruptcy.  You can't

6    spin the world back and say, Hey, we really did file all

7    these petitions.  They've never filed a petition.

8           And, finally, Your Honor, the trustee is not the

9    Department of Justice.  The trustee has no roving commission

10   to do whatever he views his brand of justice is.

11          His sole dictate under the Bankruptcy Code is to

12   administer the estate, which is in Chapter 11, and to recover

13   for the benefit of creditors of that estate.

14          Victims of the alleged misconduct of Mr. Kwok will

15   be dealt with through restitution and the Department of

16   Justice.  And there's money that has been seized and that

17   will be dealt with through the civil forfeiture process.

18          To be clear, no trustee has ever attempted to

19   bring the types of claims that have been brought here.  The

20   type -- and certainly not on a massive scale.  Allowing

21   retroactive rearrangement of the capital structure of the

22   northern transferors without regard to creditor and ugh

23   stakeholder rights would be unprecedented and not allowed.

24          As Counsel pointed out, there has to be specific

25   allegations of a lack of harm.  That is not in there.

 1  There's -- it could not be in the pleadings.  There's no

 2  basis for the trustee to make those claims.

 3          The trustee seeks to invert and pervert the law,

 4  which should not be allowed.  For these reasons, the motions

 5  to dismiss for my client should be granted.  Thank you.

 6          THE COURT:  Thank you.

 7          MR. KINDSETH:  Good morning, Your Honor.

 8          Stephen Kindseth, Zeisler & Zeisler, for Zeisler &

 9  Zeisler.  As to the four issues, Your Honor, I don't have

10  anything to add.  We support and embrace the arguments of

11  counsel for the Joint Defendants and Attorney Sklarz.

12          THE COURT:  Okay.

13          MR. KINDSETH:  But thank you very much for

14  providing me with an opportunity to make an argument --

15          THE COURT:  Thank you.

16          MR. KINDSETH:  -- if I had one to add.

17          THE COURT:  Thank you.  I appreciate it.

18          All right.  Attorney Bassett, your reply?

19          MR. BASSETT:  Your Honor, may I approach?

20          THE COURT:  Yes, please.

21          MR. BASSETT:  Good morning, Your Honor.

22          Again, Nick Bassett for the record, from Paul

23  Hastings, counsel to the Chapter 11 Trustee.

24          Your Honor, I'll try to fit my argument,

25  obviously, within my allotted time.  There's a lot of points

1  to respond to.  And I'm also, obviously, happy to answer any

2  questions that the Court may have.

3         Your Honor, in the arguments from counsel today,

4  and you saw in the papers, as well, you heard a lot about the

5  equities involved in this case and in the adversary

6  proceedings that the trustee has filed.  That's not

7  particularly surprising because, of course, the Bankruptcy

8  Court is a court of equity.  But, but in that vein, I think

9  it is very important to take a step back and look at how the

10  equities really weigh in this case.

11         Now, the Defendants have done an admirable job of

12  trying to play victim and tell the Court all the reasons why

13  they feel they would be prejudiced by the relief that the

14  trustee seeks.  But, Your Honor, the result that the

15  Defendants ask this Court to reach would be the very opposite

16  of an equitable result.

17         Now, to level set, this bankruptcy case and its

18  thousands of docket entries, with which this Court and the

19  parties are very familiar, is all about Mr. Kwok's fraudulent

20  years-long scheme to file for bankruptcy, contending to have

21  zero assets, after hiding all of his assets that he does own

22  in a web of shell companies.  And, Your Honor, the scale of

23  that fraud perpetuated by Mr. Kwok is truly massive; in fact,

24  I don't think it's going out on a limb at all, to say that

25  there's never been a bankruptcy case quite like this one, at

1  least not of this magnitude, where you have an individual

2  debtor who is, in reality, a billionaire, living the most

3  lavish lifestyle one could imagine, who then files for

4  bankruptcy, claiming to own, essentially, nothing, because he

5  had operated his life and his affairs in a way where he

6  tucked all of his wealth into shell companies under his

7  control.

8          Now, what the Defendants ask of this Court to do

9  practically, by denying the trustee's avoidance claims, is to

10 legitimize Kwok's years-long fraudulent scheme by holding

11 that his shell companies were, in fact, truly separate

12 companies, such that when they transferred assets to the

13 Defendants, those transfers were not transfers of Kwok's

14 assets.

15         Stated differently, in the Defendant's world, any

16 individual who operates their affairs the way Kwok did, could

17 file for a bankruptcy, claiming to have no assets, despite

18 that person being a billionaire.  And then the trustee in

19 that bankruptcy case could never assert avoidance claims

20 against anyone, because the transfers that took place prior

21 to the bankruptcy or thereafter, were, according to them, not

22 transfers by the debtor, but, rather, transfers by his

23 separate shell companies.

24         Your Honor, as applied to this case, where they're

25 trying to eviscerate the trustee's ability to even pursue

1  avoidance claims because Mr. Kwok had no assets, is a truly

2  absurd outcome that is fundamentally at odds with the

3  Bankruptcy Code.  Now, Attorney Peterson mentioned that the

4  result they seek is noted trying to deprive the trustee of

5  remedies, but that's exactly what they're trying to do.

6          The cause of action that the trustee is pursuing

7  are causes of action that are consistent with the reality in

8  which Mr. Kwok operated.  He had all of his assets in shell

9  companies and then those shell companies conducted his

10 affairs.  They made transfers to parties.  They did other

11 things.  And the only way, consistent with that reality for

12 the trustee to pursue his claims and to pursue his rights

13 under the Bankruptcy Code, is to pursue transfers of those

14 assets, consistent with the economic reality that they were

15 transfers of Mr. Kwok's assets.

16         Now, Your Honor, I'll Attorney Kim through the

17 various arguments that Counsel had made on the four issues

18 this we're here to discuss today and explain why the

19 Defendants are wrong on each one of them.

20         Now, there was a lot of discussion about the

21 Manichaean case and the Defendants used that case and other

22 authorities to contend that the trustee's alter-ego claims

23 must fail, and by extension, his fraudulent transfer and

24 Section 549 claims must fail, because the Defendants are,

25 equity holder allegedly quote, unquote, inconsistent third

1  parties who had no involvement in or knowledge of Mr. Kwok's

2  fraud.

3          Your Honor, there are several problems with this

4  argument.  First, and I'm not going to get law of the case

5  because I know that's an argument that the Court does not

6  want to hear, but law of the case or not, as a matter of

7  precedent, this Court has already issued rulings, finding

8  that Lamp Capital, Golden Spring, Greenwich Land, and the

9  HGHK entities are the debtors' alter-egos.  We submit those

10  rulings were correct and they should not be disturbed.

11          Second, the Defendants are wrong in their

12  description of how alleged harm to third parties factors into

13  the alter-ego analysis under Delaware law.

14          Now, the Defendants seem to contend, based on

15  their reading of Manichaean and other cases, that an alter-

16  ego finding under Delaware law is unavailable, if there will

17  be a single, quote, unquote, innocent person, who could be

18  harmed by that outcome.

19          But that is fundamentally not the law.  If you

20  look at what the cases say, the law focuses on the overall

21  equities of the situation, not whether a single party will be

22  harmed, and, in particular, the doctrine is focused on

23  preventing fraud, just like that which occurred here.

24          Now, to discuss Manichaean, the Defendants, of

25  course, seize on language in Manichaean where the Chancery

1   Court said that it would, you know, only even consider

2   reverse veil-piercing if there's a lack of real prejudice,

3   real and sustainable prejudice to third parties.  But they

4   are selective in how they quote the case, because they ignore

5   critical other language from the Chancery Court that provides

6   additional context to what the Court really meant in issuing

7   its ruling, describing the availability of reverse veil-

8   piercing under Delaware law.

9           Specifically, the Chancery Court said:

10          "The risks that reverse veil-piercing may be used

11  as a blunt instrument to harm innocent parties and to disrupt

12  the expectations of arm's-length arbiting, while real, do

13  not, in my view, justify the rejection of reverse veil-

14  piercing outright; rather, the recognition of the risks

15  creates an opportunity to manage them and do so in a manner

16  that serves the interests of equity.

17          The Court also stated that without reverse veil-

18  piercing, quote:

19          "Fraudulent members of the company could hide

20  assets in plain sight to avoid paying a judgment, which would

21  be, quote, an unacceptable outcome."

22          Again, I think that's exactly what we're dealing

23  with here with Mr. Kwok.

24          And, finally, the Court said, quote:

25          "Fundamentally, reverse veil-piercing, like

1   traditional veil-piercing, is rooted in equity and the Court

2   must consider all relevant factors to reach an equitable

3   result."

4          In summary, Manichaean stands for the proposition

5   that under Delaware law, reverse veil-piercing can and should

6   be used to prevent someone like Mr. Kwok from using his shell

7   companies to carry out a fraudulent scheme and to achieve an

8   overall, equitable result for the parties.  That is exactly

9   what we are trying to do with our avoidance claims in this

10  case.

11         Now, Your Honor -- with our alter-ego claims in

12  this case -- now, Your Honor, there are, to be sure, that

13  support the same result from other jurisdictions by framing

14  the alter-ego analysis as a balancing test that's

15  specifically designed to prevent fraudulent schemes from

16  being upheld and recognized, even if other creditors or

17  certain parties could potentially be harmed by that.

18         The In re Mass case that we cite in our papers is

19  instructive.  That's at 178 B.R. 626.  It's a Middle District

20  of Pennsylvania case.

21         In that case, debtors' shareholders moved for

22  turnover of funds deposited in a bank account of their

23  wholly-owned corporation on a reverse veil-piercing theory

24  under Pennsylvania law, alleging that the corporation was the

25  alter-ego of the shareholders and, therefore, they were

1   entitled to turn over the monies in the account.

2          The Court granted that motion over the objection

3   of the creditor who did business with the alter-ego, arguing

4   that it would be harmed by that result.  In doing so, the

5   Court noted that reverse veil-piercing in that instance,

6   rather than harming third parties would, quote:

7          Aid all creditors of the bankruptcy estate and

8   that the business creditor Defendant who objected to the

9   relief is a -- should not enjoy preferential treatment,

10  simply because that party happened to contract with a sham

11  corporation.

12         In other words, in a situation like this, where

13  there are parties who -- and I'll get to whether or not these

14  Defendants are even actually harmed -- but it resulted -- the

15  trustee seeks to believe they are not, but even if they were,

16  the relief that the trustee is seeking is simply to put them

17  on equal footing with all other creditors of the debtor, to

18  not give them preferential treatment and not allow them, Your

19  Honor, to benefit from the years-long scheme that Kwok had

20  perpetuated by asking the Court to uphold that scheme and

21  allow their -- the monies that they received from Kwok shell

22  companies to not be subject to the avoidance provisions of

23  the Bankruptcy Code.

24         It furthers the fundamental principle underlying

25  bankruptcy that all of the debtors' assets should be gathered

 1  and distributed for ratable distribution to his creditors.

 2           Your Honor, there are other cases, as well, that

 3  we cite in our brief that talked about reverse veil-piercing

 4  designed to achieve an overall equitable result, which I

 5  won't repeat here.  One of them is the In re Schuster case.

 6  Another is the Petters Co. case.

 7           But I want now to turn --

 8           THE COURT:  Can you -- I'm not -- can you just

 9  spell those for the record, please.

10           MR. PETERSON:  Sure.

11           Schuster is S-c-h-u-s-t-e-r.  And Petters Co. is

12  P-e-t-t-e-r-s.

13           THE COURT:  All right.

14           MR. PETERSON:  Now, Your Honor, I want to address

15  another point that the Defendants raised on multiple

16  occasions, which is that in their view, if it is true that

17  Delaware law prevents reverse veil-piercing in a situation

18  where innocent parties may be harmed by that outcome, they

19  contend that, then, that somehow transforms that issue into a

20  pleading requirement, such that the trustee must have

21  affirmatively plead in his complaint that no party could

22  possibly be harmed by the results that he seeks.

23           Again, that's not the law, but even if it were the

24  law, it's certainly not a pleading requirement.  And I find

25  it ironic that the Defendants rely exclusively on Manichaean

1  to support that argument.  If you look at what happened in

2  Manichaean, Your Honor, and this is at page 718 of that

3  decision, the Court specifically held that it is not a

4  pleading requirement, because in that case when the Court

5  analyzed the alter-ego factors and ultimately determined that

6  reverse veil-piercing was appropriate, it noted that a party

7  had document forward and made an argument about harm.

8          And the Court rejected it at that stage saying,

9  quote:

10          "To be clear, factual allegations related to the

11  alleged alter-ego's third-party creditors are not in the

12  complaint.  And for now, at least, my analysis is conformed

13  to the four corners of the pleading."

14          So Manichaean stands for the exact opposite

15  proposition on that issue, Your Honor.

16          But, finally, even if there were a pleading

17  requirement, even if the innocence of parties who might be

18  harmed by reverse veil-piercing, even if that were all

19  relevant under Delaware law, which it is not, allowing the

20  trustee to pursue avoidance claims against these Defendants

21  in bankruptcy cases does not mean that they will be quote,

22  unquote, harmed by the alter-ego ruling.

23          As this Court well knows, and as the Defendants

24  and their counsel well know, innocent -- quote, unquote,

25  innocent parties are unknowingly affected by bankruptcy all

1  the time, especially through preference and avoidance

2  actions.

3        Now, this may be unfortunate for parties in that

4  position, but that is, unfortunately, just the way bankruptcy

5  works, because, again, it is part of the fundamental process

6  of ensuring a ratable distribution of assets for a debtor's

7  creditors and treating all of those creditors equally.

8        This can be seen through some easy examples in the

9  Code, Your Honor.  For example, the law is clear that on a

10 Section 548 fraudulent transfer claim, the Court looks only

11 to the debtor/transferor's intent in determining whether the

12 transfer is fraudulent and it doesn't matter whether the

13 transferee acted with fraudulent intent.  The transferee

14 could be innocent.  It would not affect the viability of

15 a 548 claim by a trustee or a debtor-in-possession.

16       The same is true for a Section 549 claim, Your

17 Honor.  The Code says nothing about the transferee who

18 received a 549 claim needing to have known that it received

19 an unauthorized transfer from a debtor in bankruptcy.

20 There's no knowledge requirement.  There's no requirement

21 that the transferee not be innocent; all that matters is that

22 the transfer occurred post-petition and was unauthorized.

23       So, here, Your Honor, the Defendants, we would

24 submit, are not being harmed at all, at least not in the

25 context of the way is that bankruptcy works.  They are simply

1  subject to the same avoidance provisions of the Bankruptcy

2  Code as any other party.  To the extent they have defenses

3  that they want to raise to the trustee's claims, such as a

4  value defense under Section 548(c) or otherwise, they can

5  offer those defenses, but it does not mean that the trustee's

6  claims are defective.

7       Last point, Your Honor, on this issue is I would

8  note that any harm they allege, at least potential economic

9  harm that they allege, is entirely premature, because to the

10 extent the Defendants end up needing to pay a judgment to the

11 trustee on account of the trustee's fraudulent transfer or

12 post-petition transfer claims, they have the right to assert

13 a claim under Section 502(a) to the Bankruptcy Code.

14      Now, I agree with Counsel, we're not saying -- I'm

15 not standing here today saying that all creditors, including

16 these avoidance Defendants, to the extent they assert claims,

17 are going to be paid whole on their claims in this case;

18 creditor recovery levels obviously remain to be determined.

19 My point is that their harm argument is, at least, (A),

20 premature, and (B), this is consistent with the derivative in

21 Manichaean that innocent parties who might be in some way

22 affected by an alter-ego ruling should, when a Court issues

23 that ruling, have some way to manage their risk, consistent

24 with equity.

25      The Bankruptcy Code provides for that.  It

1  provides for that through defenses they can assert under the

2  Bankruptcy Code.  It provides to that through a

3  Section 502(a) claim, Your Honor.

4         Your Honor, I next want to address, and I realize

5  I don't have a whole lot of time left, but I want to make

6  sure I address the other arguments.  Now, the Defendants

7  spent a lot of time talking about the consequences of alter-

8  ego and whether or not that results in the alter-ego's assets

9  becoming property of the debtor.

10        Again, the Court decided this issue.  We think its

11 prior rulings are precedential, you know, separate and apart

12 from law of the case, which we're not talking about today.

13 And in any event, though, this argument, Your Honor, fails on

14 its merits for two reasons.  First, as we discussed in our

15 papers, the question of whether or not an alter-ego ruling

16 results in the assets becoming property of the estate is

17 fundamentally a question of federal bankruptcy law, not state

18 law.

19        Second, even if state law applies, and there is

20 this distinction that Defendants' claim exists between the

21 so-called vicarious liability theory and the identity theory,

22 we made the clause clear that Delaware follows the identity

23 theory.

24        Now, on the federal v state law distinction, Your

25 Honor, we cite cases in our brief.  These are at pages --

1 sorry --  paragraphs 25 through 27 of our objection.

2 Numerous courts have explained this general concept that,

3 while -- and that is wholly consistent with the Supreme

4 Court's decision in <u>Butner</u> -- that while the nature and

5 extent of property rights in bankruptcy are, in the first

6 instance, determined by the state substantive law.  Once that

7 determination is made, federal bankruptcy law, namely,

8 Section a 41 of the Bankruptcy Code, dictates to what extent

9 that interest becomes property of the estate.

10 Again, I would point the Court to the cases

11 assembled at paragraphs 25 through 27 of our objection that

12 stand for that general proposition.  And, Your Honor, I think

13 it's important to recognize that, you know, this notion that

14 federal law controls on the property of the estate issue

15 makes perfect sense because defining what constitutes

16 property of the estate is absolutely fundamental to the

17 bankruptcy process.

18 And I'd point the Court to the comments that

19 Justice Roberts made in his dissent in the <u>Wellness</u> case,

20 which is cited at Footnote 17 of our objection, where he

21 said:

22 "The defining property of the estate is the quote,

23 unquote, necessary starting point of every bankruptcy case

24 and it is, quote, inescapable central to the restructuring of

25 the debtor-creditor relationship and in his view, therefore,

1    the Bankruptcy Court has jurisdiction, core jurisdiction to

2    consider alter-ego claims."

3            Now, courts have taken this principle about the

4    fundamental nature of the property of the estate questions to

5    bankruptcy to heart when analyzing alter-ego claims.  Courts

6    have found, despite what defense counsel may claim, that in

7    bankruptcy, an alter-ego claim brings property into the

8    estate even if that same claim outside of bankruptcy is more

9    often used by creditors to render one entity liable for

10   another's debts.

11           So there's two steps.  Under state law, is there a

12   viable, reverse veil-piercing or alter-ego theory?  The

13   second step, in bankruptcy is, if so, what is the effect of

14   that?  That makes sense, Your Honor, because the claim in

15   bankruptcy, as it is here, is asserted under Section 541 of

16   the Bankruptcy Code.

17           Now, a decision that's instructive Your Honor, is

18   the Yerushalmi case that we cite in our papers.  I'll spell

19   that one.  That's Y-e-r-u-s-h-a-l-m-i, that's 487 B.R. 98.

20           In that case, Your Honor, Chapter 7 Trustee sought

21   a declaratory judgment that a certain trust was really an

22   alter-ego of the debtor seeking turnover of its assets.  The

23   Bankruptcy Court first determined whether the entity was an

24   alter-ego under state law, which in this case was New York

25   law; however, the Court later found that the effect of that

1  alter-ego ruling buzz an issue of bankruptcy law.

2           And the reason this mattered and the reason it

3  came up in that case was because the Defendant there changed

4  the trustee's alter-ego claim by contending that the state

5  law statute of limitations had applied.  The Court rejected

6  that argument because it found that the cause of action was

7  being brought under Section 541 and 542 of the Bankruptcy

8  Code.

9           In the course of reaching its ruling, the Court

10 explained that, quote:

11           "The facts of this case, that is, a bankruptcy

12 trustee seeking to recover estate assets on an alter-ego

13 theory, are distinguishable from non-bankruptcy alter-ego

14 cases pursued by and for the benefit of an individual

15 creditor's seeking to hold an alter-ego liable for the

16 obligations of another."

17           Your Honor, that's exactly the situation here.

18 This is not a non-bankruptcy alter-ego cause of action being

19 brought by one of Mr. Kwok's creditors outside of bankruptcy;

20 this is the trustee seeking to use the alter-ego doctrine as

21 a means to, consistent with economic reality and consistent

22 with the way the debtor had operated his affairs, issue a

23 ruling that his, the assets that he kept at his shell

24 companies were, in fact, his own assets and, therefore, are

25 assets that are property of the estate.

1          Your Honor, another case that I won't discuss in

2    detail now that said the exact same thing about the effective

3    alter-ego being different in bankruptcy compared to outside

4    of bankruptcy is the Star Mountain case, which we cite in our

5    brief.  In addition to those cases, Your Honor, we cited a

6    number of other decisions; these are at paragraphs 30 to 34

7    of our objection that talk about alter-ego theories in

8    bankruptcy and the fact that they would augment the estate

9    and result in the assets of the alter-ego becoming property

10   of the estate.

11         I will list these cases out.  I won't discuss them

12   in detail, but the point, Your Honor, is that in none of

13   these cases, where the Court is focused on this so-called

14   distinction between the identity theory and the vicarious

15   liability theory, they, instead, were issuing a determination

16   about the effect of the alter-ego decision under bankruptcy

17   law, not under the claimed nuanced distinctions that the

18   Defendants want the Court to recognize under state law.

19   That's the In re Blatstein case, Your Honor, that we cite in

20   our papers; the 10th Ave. Record Distributors case; In re

21   Pearlman; In re Concepcion; In re Deckelbaum; In re Palmieri;

22   and In re Adler, Your Honor.  All cases that refer to the

23   result of an alter-ego finding being that the assets become

24   property of the estate.

25         Your Honor, on the question of, even if there is

1   this distinction of the identity theory versus the vicarious

2   liability theory and that's relevant in bankruptcy, we submit

3   the law is very clear that in Delaware, the identity theory

4   controls.  Your Honor, I point the Court to the Spring Real

5   Estate decision.  There's been a lot of discussion about that

6   case.

7            The Defendants claim that the Court's

8   pronouncement in that case about the effect of an alter-ego

9   ruling under Delaware law was *dicta*.  But, Your Honor, *dicta*

10  or not, it is a pronouncement by the Chancery Court as to its

11  view of the result of an alter-ego theory, not only under

12  Delaware law, but in relation to a bankruptcy case.  And they

13  have cited no law to the contrary.

14           The Court said in that case, quote:

15           "Where there is a mere alter-ego of the parent to

16  the extent that the Court may engage in reverse veil-

17  piercing, the Court may treat assets of the subsidiary as

18  those of the parent for purposes of a trustee standing to

19  void allegedly fraudulent transfers of assets."

20           Your Honor, that is exactly on point.  And while

21  the Defendants claim that the Court there cited Nevada law

22  for that proposition, Your Honor, the Court was applying

23  Delaware law, and to the extent that it cited a Nevada case,

24  it cited that Nevada case because it felt that Nevada law was

25  consistent with the Delaware law and/or to agree with the

1  trustee that the effect of an alter-ego claim in bankruptcy

2  is different than it is outside of bankruptcy.

3         I would also note, Your Honor, that Manichaean,

4  the Court that -- the decision that the Defendants rely on so

5  heavily, cited approvingly to the Spring Real Estate case for

6  that same exactly proposition.  I would say, Your Honor, at a

7  minimum, I think what the Manichaean decision makes clear is

8  to the extent there's any, you know, distinction between the

9  vicarious liability theory and the identity theory, I think

10  what Manichaean actually shows is that either that

11  distinction really does not exist or that in Delaware, the

12  effect is both.  And, again, that can be seen by the language

13  that Defense counsel cited in Manichaean at page 710, where

14  the Court, in two senses, back-to-back, stated the issue in

15  both ways.  It first said, quote:

16         "At its most basic level, reverse veil-piercing

17  involves the imposition of liability on a business

18  organization for the liabilities of its owners."

19         And the very next sentence, it said in the parent

20  subsidiary context:

21         "Whether the subsidiary is a mere alter-ego of the

22  parent, where the subsidiary is a mere alter-ego of the

23  parent, the Court will treat the assets of the subsidiary as

24  those of the parent."

25         So Manichaean, itself, makes clear, Your Honor,

1  that this rigid distinction that the Defendants asked the

2  Court to recognize is not one that courts in Delaware have

3  actually, themselves, recognized in their decisions.

4         Your Honor, I know I'm short on time, but the last

5  argument that I do want to make sure I address is this

6  retroactivity argument.  Your Honor, I want to put to rest

7  any notion that the trustee is actually seeking *nunc pro tunc*

8  relief from the Court.  The trustee is not.

9         And I think in the Court's comments in September

10  at the hearing were exactly correct that the way to look at

11  this is if the Court were, for example, asked to rule whether

12  a contract was breached five years ago and the Court rules

13  that it was, then that's what happened.  The Court is not

14  granting *nunc pro tunc* relief; it is simply adjudicating the

15  issue put before it.

16         And I would point the Court to the In re Adler

17  case that we cite, and that's at page 58 of the decision,

18  Your Honor, where the Court noted -- and that was a Court

19  dealing with New York law -- but I think for purposes of

20  discussing how an alter-ego claim works, it is instructive.

21  And what the Court said is that the alter-ego finding comes

22  into effect and establishes the relative rights of the alter-

23  ego and the controlling party, quote:

24         "At the moment in time at which the factual

25  elements for alter-ego are satisfied."

1          So, that's exactly what the Court has found and

2    that's what we're asking the Court to, again, reiterate today

3    in these adversary proceedings, is that these entities, these

4    transferor entities were always Mr. Kwok's alter-egos from

5    the beginning of time.  It's not that they became his alter-

6    egos after the bankruptcy.  It's not that they became his

7    alter-egos at any other point in time.  They were always his

8    alter-egos and, therefore, their assets were always

9    Mr. Kwok's assets.

10          That is the issue we're asking the Court to

11   adjudicate, based on the facts that we are putting forward.

12   It's not *nunc pro tunc* relief at all.

13          On the issue of retroactive relief, Your Honor,

14   the Defendants noted that they don't think there's been a

15   single case cited where a Court has used an alter-ego theory

16   to allow Section 549, post-petition fraudulent transfer

17   claims to proceed.  There are at least a few examples of

18   that, Your Honor.  The In re Schuster case that I already

19   cited is such an example, where the Court allowed -- where

20   the Court said that Section 549 claims could go forward,

21   following an alter-ego finding.

22          The In re Deckelbaum case that I cited is another

23   case.  We cite the In re Harman case from the Bankruptcy

24   Court, for the Northern District of Georgia, in our papers.

25   That's another case where that happened.  And, also, as

1   Counsel acknowledged, the <u>American International Refinery</u>

2   indication is, yet, another example, as is the -- so that --

3   sorry.

4            Those are the examples of 549 cases, Your Honor,

5   and those are in addition to the cases that we cite where

6   courts like the <u>Spring Real Estate</u> case, <u>In re Palmieri</u>, and

7   others have held that an alter-ego finding certainly allows

8   the pursuit of fraudulent transfer claims based on transfers

9   of assets made by those alter-egos prior to the alter-ego

10  finding.  Again, no discussion of *nunc pro tunc* relief in

11  those cases because it was simply not necessary.

12           Just two more completing points before I wrap up,

13  Your Honor.  First, I want be to make sure I address the

14  <u>Duckworth</u> cases that the Defendants rely on so heavily.

15  Those cases are distinguishable for a number of reasons.

16  First of all, <u>Duckworth</u>, that was a Chapter 7 case out of

17  Illinois, applying Indiana law.  It involved a Chapter 11

18  debtor who transferred certain assets to his shell company's

19  bank account just before his bankruptcy and then right after

20  the bankruptcy, those shell companies, then, made transfers

21  to third parties who ended up becoming Defendants in the

22  avoidance action.

23           Now, the Court ended up rejecting the trustee's

24  claim as the Defendants described, but the decision and its

25  reasoning is inapposite here for at least four reasons.

1    First of all, the Court, in that case, declined to apply the

2    alter-ego doctrine in the first place.  It noted that the

3    applicable state law, as I said, was Indiana law and the

4    Court predicted that the Indiana Supreme Court would not even

5    apply the doctrine.  Obviously, that's not the case here.

6    Delaware recognizes the trustee's alter-ego claims.

7            Second, Your Honor, the Court declined to apply

8    alter-ego to permit the Section 549 claims to proceed in that

9    case, in part, because the only parties who had found to be

10   harmed by the alter-ego relationship were secured creditors

11   who had not even benefited from the trustee's pursuit of the

12   claims.  So there was no real benefit to constituents of the

13   estate by the trustee successfully pursuing the claims;

14   again, not the case here.  All the debtors' creditors will

15   benefit from the trustee's avoidance claims, should they be

16   successful.

17           Third, Your Honor, and this is critical and the

18   Defense counsel spent a lot of time on this, the Court felt

19   that in that case, it was very clear that the trustee was

20   using alter-ego as a litigation tactic to try to get around

21   the defenses that the Defendants would otherwise have as

22   subsequent transferees under Section 550 of the Bankruptcy

23   Code.  But that was highly dependent on the facts of That

24   case, Your Honor.

25           In that case, as I said, right before the debtor

1  filed for bankruptcy, he took money from his account,

2  transferred it into the bank accounts of his shell company,

3  and then after the bankruptcy, those shell companies further

4  transferred the funds to certain third parties who became

5  Defendants.

6          Under those circumstances, the Court observed that

7  consistent with that factual record and that factual reality,

8  the Court thought the trustee should have asserted 548

9  claims, based on the prepetition transfer by the debtor to

10  the shell company and then sought to obtain relief, if at

11  all, from the Defendants through a subsequent transferee

12  claim and then the Defendants could assert their Section 550

13  defenses.

14          But, Your Honor, that is absolutely not even close

15  to what happened here.  That is not our facts.  There is

16  absolutely no record to support that that is how the trustee

17  is trying to use his alter-ego and avoidance claims in this

18  case.  This is not a situation where Mr. Kwok sat around with

19  a bunch of money in a bank account and divvied it outed to

20  his shell companies before the bankruptcy and then we decided

21  rather than suing the shell companies and then these

22  Defendants as subsequent transferees, we would just try to

23  collapse it and pursue Section 549 claims.

24          That's not it at all, because that's not how Kwok

25  operated; Kwok operated his affairs by keeping all of his

1   assets with these shell companies and then using them as he

2   saw fit to pursue his own personal ends.

3          And so, Your Honor, the way we are pursuing our

4   claims, just, it fits that reality and it is the -- it's

5   really the -- it wouldn't make sense to pursue the claims in

6   the way that the Court in Duckworth suggested, because that's

7   not what happened here.  The transferees, the holders of the

8   assets were the Kwok shell companies; they were his assets

9   and that's why we are pursuing these claims as transferors of

10  assets of the estate.

11         The last reason that Duckworth is distinguishable,

12  Your Honor, because -- and this is sort of similar total last

13  point that I made -- is that the Court emphasized that the

14  trustee was seeking to use alter-ego in a selected way.  And

15  if you look at the 2013 decision, the second decision from

16  that case, this is at page 6 of the opinion, the Court

17  emphasized the fact that the trustee was not seeking alter-

18  ego for all purposes.  He was seeking it, specifically and

19  solely, for the purpose of pursuing those avoidance claims;

20  again, not the case here, Your Honor.

21         The trustee has pursued alter-ego claims against

22  these entities to establish that they are and always have

23  been, consistent with reality, alter-egos of Mr. Kwok that

24  were used to hold and hide his assets from his creditors.

25  And a consequence of that, Your Honor, unlike in the

1  Duckworth case, is that all other creditors of those entities

2  will have the opportunity to assert claims.  We've made this

3  point in the past.

4         All consequences of the alter-ego ruling follow

5  from the Court's orders, not simply -- it's not simply a

6  litigation tactic or vehicle by the trustee.

7         The last point --

8         THE COURT:  I'm going to have you wrap up, okay,

9  to be fair.

10        MR. BASSETT:  Yes, Your Honor.

11        The last point I'll make is just on the

12  relationship between the claims that the trustee is seeking

13  and substantive consolidation.  Your Honor, the relief that

14  the trustee seeks may, in fact, and I would agree, does, seek

15  a result that is similar to substantive consolidation, but

16  the doctrines are not the same and they can and do coexist.

17        On this point, I would refer the Court to the Star

18  Mountain case.  There, there was a confirmation order in

19  place that specifically precluded substantive consolidation.

20  The trustee, the litigation trustee, after confirmation,

21  sought to pursue alter-ego claims and the question was

22  raised:  Well, can the trustee pursue those claims in light

23  of the confirmation order?

24        And the Court said, Yes, the trustee could pursue

25  the claims because, although alter-ego sought a result

1  similar to substantive consolidation, it is, in fact, a

2  different legal doctrine and, in particular, substantive

3  consolidation is not one that is predicated solely on

4  demonstrating that a debtor had used other entities to

5  effectuate fraud.  It's based on creditor expectations and

6  hopeless entanglement.

7          And because of the standards that apply to subcon,

8  it makes sense in many instances for courts to take a step

9  back and consider whether a subcon result should apply

10 retroactively, or *nunc pro tunc*, to the petition date.

11         But here, Your Honor, we're not seeking subcon;

12 we're seeking a ruling, as I described before, from this

13 Court simply recognizing the economic reality of how Mr. Kwok

14 operated.  He has always held his assets with shell companies

15 and he's done that for the purpose of keeping all of his

16 wealth outside the reach of his creditors.

17         We think for the Court to issue the relief that

18 the Defendants are asking the Court to issue would

19 effectively bless that fraudulent fiction and result in

20 significant prejudice to the estate and to the debtor's

21 creditors, Your Honor.

22         And with that, I have nothing further unless the

23 Court has questions.

24         THE COURT:  I do not have any questions, thank

25 you.

1          What I will do is I will take a short recess and I

2   will allow the Joint Defendants and the trustee, one, you can

3   reply; two, Attorney Bassett, and Attorney Bassett, you can

4   reply to their reply.  One final, short argument, here, I'm

5   going to allow you to do.

6          I'm probably not going to give you more than 10

7   minutes apiece and you will have to decide who you want to

8   have argue that, okay.  And what I'll do now is I will take a

9   recess and I'll be back at 12:35 and then I'll give the Joint

10  Defendants 10 minutes and the trustee 10 minutes and then we

11  will conclude the hearing.

12          Does anyone have any questions?

13      (No verbal response)

14          THE COURT:  Okay.  Thank you.

15          Then, court is in recess until 12:35.

16          THE DEPUTY:  All rise.

17          The court is in recess until 12:35.

18      (Recess taken at 12:25 p.m.)

19      (Proceedings resumed at 12:37 p.m.)

20          THE DEPUTY:  All rise.

21          The court is in session after recess.

22          THE COURT:  Please be seated.  Thank you.

23          Well, I don't know if everybody is here yet, but

24  that's okay, they'll come back, I hope.  Maybe they decided

25  to leave?

1        (Laughter)

2             THE COURT:  No, I'm only kidding; I know they were

3    outside talking, but maybe somebody could get them.

4             Oh, here they come.  Here they come.

5        (Pause)

6             MR. GOLDSTEIN:  Apologies, Your Honor.

7             This is one of the things that happens when you

8    have a lot of cooks in the soup.

9        (Laughter)

10            THE COURT:  Not a problem.

11            MR. GOLDSTEIN:  Thank you for your indulgence.

12            THE COURT:  I just wanted to make sure you didn't

13   leave.

14       (Laughter)

15            MR. GOLDSTEIN:  And miss this?  No.

16            THE COURT:  No.

17            So, Attorney Peterson and Attorney Goldstein,

18   which of the two of you will make the concluding argument?

19            MR. GOLDSTEIN:  I guess I drew the short straw,

20   yet again, so...

21            THE COURT:  Go right ahead, then; please proceed.

22            MR. GOLDSTEIN:  Okay.  All right.

23            A few points, Your Honor, just targeted.  I don't

24   even think I'm going to take my 10 minutes -- famous last

25   words, but I think that's where I'm going to land.

1        The point we made on the 549 cases was, and I

2    didn't hear when Attorney Bassett was saying it, but he may

3    have said it and I maybe missed it, was that we said it's not

4    a non-insider 549 case that we're trying, right.  So, Harman,

5    Schuster, both involved the debtor and their spouse.  I think

6    Deckelbaum, I think, was one of the cases they cited, also,

7    was actually the law firm that was setting up the entities

8    post-petition that's kind of involved in it.

9        American International, which I addressed

10   initially, which was also a set, I think, cited, also, was

11   they never dealt with 549.  The transparent issue in that

12   case was a prepetition transfer, so we'll leave that there.

13       You know, in Duckworth they were trying to

14   distinguish Duckworth.  One of the grounds was the fact that,

15   oh, well, there was only -- the only party who would benefit

16   would be the secured creditor.  But, you know, reading -- if

17   you read the Duckworth decision, the Duckworth Court says --

18   and I lost my page when I was coming in, but I had it -- the

19   Court says after discussing that issue, the fact that,

20   potentially, the party to benefit would be the secured

21   creditor.  It goes on and says -- and this is at page 4 --

22   the more serious problem with the trustee's actions, concerns

23   the overbroad application of the alter-ego doctrine.  So, I

24   don't think you can just discount the analysis.

25       The other issue raised in trying to distinguish

1  Duckworth was that the -- I think, if I remember hearing

2  Attorney Bassett right -- was that saying, well, you know,

3  this is just -- the debtor deposited money in Power Trading

4  and then Power Trading, you know, made these payments to the

5  trade creditor.

6          The scheme was a little bit more involved than

7  that, right.  The money went to these two LLCs, which he used

8  to defraud his creditor, to shield his money, even by using

9  them to take the proceeds to the grain sales.  The debtor

10 withdrew the money from that account, and as I read the

11 Court's decision, and Your Honor can read it, as well, he

12 then deposited the money in Power Trading.  So, he was trying

13 to keep the money in the LLCs in a very similar fashion that

14 was alleged here.

15         Let me see if there's anything else in Duckworth

16 that I was going to say.

17      (Pause)

18         MR. GOLDSTEIN:  Yeah, I think that covers the

19 waterfront there.

20         There was a reference to the In re Mass case, M-a-

21 s-s, and I just wanted to address that very quickly, about

22 that there's not a harm for having to return funds based on

23 reverse veil-piercing.  See, that was a turnover case; that

24 was an instance where a judgment creditor, who -- the

25 judgment creditor had a judgment against the entity and it

1  also had a guaranty debt against the debtor.

2         Post-petition, that judgment creditor, then,

3  seized the funds in an account that was called a "DIP

4  account," a debtor-in-possession account.  So it was -- it

5  didn't even involve any avoidance claims.  You don't have

6  that 550 issue overlay; it was a 542 turnover claim, so it's

7  a different type of claim here.

8         Moreover, you have this issue of a creditor who

9  had to have known of the bankruptcy and then seized an

10  account that was titled the "debtor-in-possession account."

11  So, I think it's distinguishable on its facts there.

12         You know, I think -- just two concluding points.

13  There's an argument that if you allow -- if you, Your Honor,

14  determines to have the protections that we've discussed in

15  Manichaean for third-party creditors, the protections in

16  Auto-Train, the protections in Duckworth, in Lawler, that

17  you're somehow, we'd be somehow, essentially, like, letting

18  Mr. Kwok get away with what he did or blessing his fraud.

19         Again, you know, not so.  There are other

20  remedies.  They could have pursued an involuntary petition.

21  They could have pursued claims as a subsequent transferee,

22  but it's also a reflection of the balancing, right, it's

23  ultimately a reflection of a balancing, a balancing of trying

24  to, you know, through avoidance powers and the like to

25  recover assets to benefit creditors.

1    But it's also not to harm, you know, third parties

2  in their reasonable expectations, that the entity that

3  they're dealing with are distinct.  And it gets to the same,

4  that concern in Auto-Train, like, you know, when we start

5  upsetting the apple cart, particularly on a 549 claim, which

6  you can't, you know, innocent creditors can talk about risk

7  with 547 and 548, because you have defenses.  You have

8  ordinary course, or 547, subsequent new value; 548, you have

9  the 548(c) defense.  549 is a whole different animal, right.

10 You have much less.

11   But it's that balance, right.  It's the balancing

12 of those harms.  And then, finally, in conclusion, you know,

13 I think what it was telling was kind of at the end, right,

14 where Attorney Bassett said, look, at the end of the day,

15 this is kind of the same result as substantive consolidation,

16 right.  That's what we're doing; we're consolidating assets,

17 consolidating liabilities.

18   So, again, I'll end with one of the -- where I

19 mentioned in my presentation, which is how do you impose two

20 equitable doctrines, right, substantive consolidation and

21 alter-ego, but you're doing it in such a different way, where

22 it's the same fact pattern.  It's the same concerns that were

23 at issue in Auto-Train, whether the Court hesitated in doing

24 it *nunc pro tunc* to the prejudice of Midland Ross.

25   It just makes no sense where you employ the two

1  equitable doctrines in such a distinct manner.  And unless my

2  colleagues -- you know, okay.  They're saying that I

3  finished, so thank you very much."

4          THE COURT:  Okay.  Thank you.

5          Attorney Bassett?

6          MR. BASSETT:  Again, Your Honor, for the record,

7  Nick Bassett, counsel for the Chapter 11 Trustee.

8          Your Honor, just a few concluding points.  First

9  of all, to respond to Attorney Goldstein's comments about the

10 Section 549 cases that I mentioned during my presentation,

11 his points that he just made was that they don't believe any

12 of those cases involved non-insiders.  So that all of those

13 cases involve 549 claims against insiders.

14         I would challenge the Court to review those cases

15 and to find anywhere in those cases that distinguish between

16 insiders and non-insiders.  That was not at all the basis for

17 the decisions by those courts.  The basis for the decision by

18 those courts was simply that they recognized that there was

19 an alter-ego finding.  The consequence of that alter-ego

20 finding was that the alter-ego's assets were always assets of

21 the estate.  And the transfers of the assets that occurred,

22 occurred after the petition date, full stop.

23         I'd challenge the Court to look at Section 549 and

24 find any distinction in Section 549 between claims to

25 insiders and claims to non-insiders.  It doesn't exist.

1          Conversely, I would make the point that the

2    Defendants have not cited a single case like this one, where

3    a debtor -- there may be other cases where debtors have had

4    alter-egos and courts have dealt with those in a variety of

5    different manners.  This case, and I stressed this at the

6    outset of my presentation and I'll stress it again, I would

7    submit is unlike any other case in the history of Chapter 11

8    bankruptcy, at least on this scale.  We're talking about a

9    billionaire who filed for bankruptcy, saying he had zero

10   assets, because every single one of the assets that he had,

11   that he used to live his lavish lifestyle, that he used to

12   conduct his affairs, was tucked into a shell company.

13         The consequence of the ruling there, asking the

14   Court to make would be in that situation, that's tough.  The

15   trustee cannot pursue a single avoidance claim because every

16   transfer of every asset that occurred prior to the bankruptcy

17   and after the petition date, was not a transfer by the debtor

18   of his assets; it was a transfer by this fictional shell

19   company that Mr. Kwok created.  That would be an incredibly

20   unjust result that is inconsistent with economic and

21   practical reality, and inconsistent with the law.

22         Your Honor, I'll respond to the balancing point

23   that Attorney Goldstein concluded with.  I think I tried to

24   be very clear in my presentation, if you look at Manichaean

25   and you look at what the courts say, it is a balance of all

1  the factors.  We're not disputing that.

2         What we are disputing is this notion that there's

3  a requirement in the law that there cannot even be a

4  possibility of harm to any party before the Court can issue

5  an alter-ego ruling.  That's fundamentally not what the case

6  law says.

7         I also need to emphasize, again, that this whole

8  argument shouldn't even be being raised right now because

9  there's not a pleading issue.  To the extent they want a to

10  come forward later and say, you know what, we're innocent.

11  We had no idea, and, by the way, I do not conceded that all

12  these Defendants were, in fact, innocent.  I didn't know

13  about these transfers that they received from Mr. Kwok, but

14  to the extent they want to make that argument, they can come

15  forward and make that argument later as an affirmative

16  defense.  As Manichaean, the case that they say the Court

17  should follow said, that is not a pleading issue.

18         In addition, Your Honor, on this whole idea of

19  balance, I don't see any better way to balance the harms and

20  benefits of the ruling that the trustee is seeking by relying

21  on the Bankruptcy Code.  I think that's why so many cases

22  have said an alter-ego claim operates differently in

23  bankruptcy.

24         In bankruptcy, you have inherent protections built

25  in by the Bankruptcy Code.  These parties can pursue defenses

1   that they have.  They're not completely being deprived of

2   defenses.  They may wish that they were being sued as

3   subsequent transferees, even though that's not the way the

4   facts point out here, but they had defenses of a subsequent

5   transferee.  But they have other defenses under the

6   Bankruptcy Code.

7           They can also assert claims, as I said, against

8   the estate; that's the whole point.  That's how this works.

9   People affected by Mr. Kwok's fraud, who have been harmed in

10  the wake of his years-long fraudulent scheme, all have

11  recourse under the Bankruptcy Code.  The Bankruptcy Code

12  first requires us to collect assets and distribute them in a

13  ratable way, which is why we were pursuing these avoidance

14  actions and then the parties who end up having to repay the

15  estate could have its claim under Section 502(h) of the

16  Bankruptcy Code for recourse.  That's the balance.  The Code

17  builds that in.

18          So, Your Honor, we think the case law that we've

19  cited fully supports the relief that we're asking the Court

20  to enter and we also think that that relief needs to be

21  entered, understanding that this is being done in the context

22  of a very unique case, unlike any other in history where a

23  debtor simply did nothing, other than hide his assets in

24  shell companies.  It's unlike any other case and the result

25  should be consent with the reality of how Mr. Kwok has

1  operated for many, many years.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          All right.  I have listened, obviously, to the

5  parties.  There were some issues that were raised today in a

6  case, or two, raised today that I have not reviewed,

7  including the Gracey case that was presented today, which is

8  fine, and I will review that.  I will review, obviously, all

9  of the submissions again, in light of the oral arguments made

10 today.

11         The hope is that, you know, obviously, I will rule

12 sooner as opposed to later.  It will take some time.  I'll

13 have to go through all these issues.  But a decision will

14 enter.

15         With regard to the record of this hearing, as I

16 said at the start, what the Court will do is make sure that

17 the record of the hearing -- and I'm looking to the courtroom

18 deputy now -- will have a list of all the Joint Defendants,

19 but what we'll do is we'll indicate who argued today for the

20 Joint Defendants and then for the specific Defendants, and

21 then who argued for the trustee, and then following that will

22 most likely be the list of the remaining Joint Defendants

23 that joined the brief, okay.

24         And then, because I'm -- the transcriber isn't

25 going to understand it if we don't do it in that manner and

1   we want the transcriber to obviously understand it, and we'll

2   go from there.

3            Does anyone have any questions?

4            MR. SKLARZ:  Your Honor, just for logistically on

5   behalf of my clients who have quote, unquote, non-joint

6   issues --

7            THE COURT:  Right.

8            MR. SKLARZ:  -- during the status conference, Your

9   Honor, I indicated we would schedule argument that was later.

10           THE COURT:  Right.

11           MR. SKLARZ:  Would you expect -- and, again, I

12  apologize for putting you on the spot -- would you want that

13  argument to occur prior to your issuing a decision?

14           THE COURT:  I don't think that that will happen.

15           MR. SKLARZ:  Fair enough.

16           THE COURT:  I think that those arguments will

17  happen after I issue a decision on the issues in the joint

18  brief.

19           MR. SKLARZ:  Thank you, Your Honor.

20           THE COURT:  I can't say that with certainty, but

21  that's what I believe.  I don't think you're putting me on

22  the spot; you're asking me a question.

23           And my answer is, I believe that these issues will

24  be decided first and then with regard to other Defendants,

25  who are not Joint Defendants, but have pending motions to

1  dismiss, those will all have to be scheduled in some way,

2  shape, or form, and I believe that that scheduling will not

3  happen, or whatever is going to happen with those matters,

4  will not happen until after this decision is rendered.

5          So, for example, could an order come out in your

6  cases that say, There's going to be a hearing on the motion

7  to dismiss on whatever date -- we'll just pick a date --

8  March 31st.  That could happen, but I would probably schedule

9  that date thinking that I will have rendered a decision on

10  all of these issues first.

11          Does that make sense?

12          MR. SKLARZ:  It does.

13          THE COURT:  Okay.  Thank you.

14          MR. GOLDSTEIN:  Your Honor, Eric Goldstein.

15          I got one question from the Joint Defendants group

16  about just the logistics.  We're rendering a decision on what

17  we just did and the work that we've done today.

18          Would it happen in the main case or would it

19  happen in the adversary?

20          THE COURT:  Well, you know, like we've done in the

21  past is, the issues -- not in the past -- what we've done in

22  connection with the joint brief is there was an orders issued

23  in the main case, a brief filed in the main case, but then

24  there was a filing made in every corresponding adversary

25  proceeding.

1           Who's going to make that filing?  I don't know.  I

2    mean, you know, sitting here right now, whether the trustee

3    is going to do it, whether the Clerk's Office is going to do

4    it, however we're going -- I don't know.  But there will

5    be -- there has to be something in every adversary

6    proceeding, okay, because in order for the record of each

7    adversary proceeding to be complete.

8           Now, will that relate you back to the main case?

9    I don't know.  Sitting here, I don't know, but we'll figure

10   that out.

11           MR. GOLDSTEIN:  Fair enough.

12           Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14           Anyone else have any questions?

15           Okay.  Well, I do appreciate the thorough briefing

16   and the oral arguments of the parties.  Obviously, everyone

17   spent a great deal of time on these issues and have provided

18   me with much to think about and to review in determining

19   these issues, so I do appreciate that and I appreciate that

20   although the parties obviously don't agree that you've -- on

21   these issues that you've worked cooperatively, and I do

22   appreciate that -- that makes the job a little easier from

23   the Court's perspective.

24           So, this is the last matter on today's calendar,

25   so Court is adjourned.

1           Thank you, all.

2           THE DEPUTY:  All rise.

3           Court is adjourned.

4      (Proceedings concluded at 12:55 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    January 17, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25